71 A.3d 1

Anthony ZEI

v.

MARYLAND TRANSIT ADMINISTRATION.

No. 62, Sept. Term, 2012.

Court of Appeals of Maryland.

May 20, 2013.

As Modified on Denial of Reconsideration Aug. 16, 2013.

Paul F. Evelius, (Wright, Constable & Skeen, LLP, Baltimore, MD), on brief, for Petitioner.

John B. Howard, Jr., Deputy Attorney General, (Douglas F. Gansler, Attorney General of Maryland, Jennifer L. Katz, Assistant Attorney General, and Steven M. Sullivan, Assistant Attorney General, Baltimore, MD), on brief, for Respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and McDONALD, JJ.

ADKINS, J.

In this case, we are asked to determine whether the State of Maryland complied with the Americans with Disabilities Act ("ADA") when it adopted and applied a federally-created safety regulation governing the physical qualifications of drivers of commercial motor vehicles. Specifically, the United States Department of Transportation ("DOT") has determined that an individual is not qualified to drive a commercial motor vehicle if that individual currently suffers from certain cardiovascular diseases. The State of Maryland followed the lead of the federal government and adopted the same standard for bus operators employed by the Maryland Transit Administration ("MTA"). We are tasked with determining whether MTA violated the ADA by firing Anthony Zei, a bus operator who failed to meet this standard.

## FACTS AND PROCEDURAL HISTORY

Under the collective bargaining agreement between the MTA and Zei's labor union—the Amalgamated Transit Union, Local 1300—every bus driver must obtain a medical certification verifying that he is physically fit to operate a bus. This certification must be renewed every two years. If the Union disagrees with the findings of the medical certification, the Union may select a doctor of its choice to perform a second evaluation. If the original doctor and the Union's doctor cannot reach a consensus on the certification of the driver, then both doctors will "jointly select a third doctor to review the case" and this third doctor's "decision shall be final and binding on both parties."

Zei began his employment as a bus driver for the MTA in 1991. By all accounts, Zei was "a very good bus driver." On December 3, 2004, Zei underwent a "workability evaluation" performed by Dr. Hench for the purpose of obtaining his necessary medical certification to operate a bus. During the

evaluation, Dr. Hench discovered that Zei had previously been diagnosed with dilated cardiomyopathy, and that Zei had "been symptomatic over the past year with shortness of breath and fatigue." Dr. Hench reported that Zei's cardiomyopathy disqualified him from the position of bus driver "based upon the Medical Guidelines of the Federal Motor Carrier Safety Administration . . . because of his increased risk of sudden death."

In January 2005, Zei consulted his own cardiologist, Dr. Gottlieb, who had been treating him since 2003. Dr. Gottlieb instructed Zei to undergo a radiology study. Based upon the results of that study, Dr. Gottlieb concluded that Zei did not have "symptomatic heart failure" and that "Zei has medical clearance to return to work with no restrictions."

Dr. Gottlieb and Dr. Hench could not come to an agreement, however, and the two doctors agreed to refer the case to a third doctor—Dr. Hartenbaum—whose determination would become final. Dr. Hartenbaum "determined that Zei was not qualified to drive under the 'medical criteria' set forth in the Cardiovascular Guidelines." As a result, on September 1, 2005, the MTA discharged Zei from its employment.

In December 2005, Zei brought this action in the Circuit Court for Baltimore City alleging that the MTA had violated his rights under 29 U.S.C. § 504—commonly known as the Rehabilitation Act. The case went to trial, and a jury found the MTA guilty of discrimination and awarded Zei $200,000. In an unreported opinion, the Court of Special Appeals reversed, holding that Zei's failure to satisfy the federally-created qualification standard for drivers of commercial motor vehicles rendered him unqualified for the position of MTA bus driver as a matter of law.

On September 21, 2012, this Court granted a writ of certiorari, *Zei v. Maryland Transit Administration,* 428 Md. 543, 52 A.3d 978 (2012), to answer the following question:

Did the Court of Special Appeals err by holding that Zei's inability, because of a heart condition, to meet the DOT standards (which the MTA applies voluntarily rather than

under compulsion of federal law), render him unqualified *as a matter of law* for an MTA bus operator position?

We shall hold that the MTA's use of the federal regulation was a properly imposed "qualification standard" under the ADA, and therefore, Zei cannot succeed on his ADA claim.[1]

## DISCUSSION

In 1990, Congress passed the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1) (2006). In relevant part, the Act provided that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to ... discharge of employees, ... and other terms, conditions, and privileges of employment." *Id.* § 12112(a), *amended by* 42 U.S.C. § 12112(a) (Supp. II 2008). "To establish a prima facie case of discrimination under the ADA, a plaintiff must demonstrate (1) that [he] is disabled within the meaning of the ADA; (2) that [he] is qualified with or without reasonable accommodation; and (3) that [he] was discriminated against because of [his] disability." *Tate v. Farmland Indus., Inc.,* 268 F.3d 989, 992 (10th Cir. 2001) (alterations in original) (citation and quotation marks omitted). At issue in this appeal, is the second prong—whether Zei was a qualified individual.

The ADA defined a "qualified individual" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment

---

1. Although Zei's claim was brought under the Rehabilitation Act, that Act provides:

> The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201–12204 and 12210), as such sections relate to employment.

29 U.S.C. § 794(d) (2006). Therefore, this opinion will discuss and apply the standards governing discrimination under the ADA.

position that such individual holds or desires." 42 U.S.C. § 12111(8), *amended by* 42 U.S.C. § 12111(8) (Supp. II 2008). To determine whether an individual is qualified for the position, the ADA allows an employer to impose "qualification standards ... that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability," so long as the standards are "shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation...." 42 U.S.C. § 12113(a); *see also Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 568, 119 S.Ct. 2162, 2170, 144 L.Ed.2d 518 (1999). Thus, if an individual fails to meet a properly imposed qualification standard, then that individual is not a "qualified individual" for purposes of the ADA and cannot maintain a discrimination claim. *Tate*, 268 F.3d at 993.

In this case, the MTA applied a federally-created job qualification standard contained in the Federal Motor Carrier Safety Regulations ("FMCSRs"), which set forth the physical qualifications for drivers of commercial motor vehicles. Specifically, the FMCSRs contain a regulation governing the qualification of drivers suffering from cardiovascular disease, stating: "A person is physically qualified to drive a commercial motor vehicle if that person ... [h]as no current clinical diagnosis of myocardial infarction, angina pectoris, coronary insufficiency, thrombosis, or any other cardiovascular disease of a variety known to be accompanied by syncope, dyspnea, collapse, or congestive cardiac failure." 49 C.F.R. § 391.41(b)(4); *see also* 35 Fed.Reg. 6458, 6463 (Apr. 22, 1970) (as amended by 35 Fed.Reg. 17418, 17420 (Nov. 13, 1970)). It is this qualification standard which the MTA applied, and Zei failed to meet.

In examining whether the MTA properly applied this qualification standard, we must resolve how the federally-created qualification standard of drivers suffering from cardiovascular disease interacts with the ADA, which allows employers to use qualification standards only if they are "shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation...." 42 U.S.C. § 12113(a). This inquiry, therefore, is

three-fold. First, are the requirements of 49 C.F.R. § 391.41(b)(4) "job-related" and of "business necessity?" Second, does the exemption of state governments from complying with the FMCSRs, found in 49 C.F.R. § 390.3(f)(2), but followed by the State's voluntary adoption of the same standard, change the answer to the first question? Third, could the MTA have adopted a reasonable accommodation?

### FMCSRs as "Job–Related" and "Business Necessity"

Fundamentally, the parties disagree over whether the ADA's requirements of being "job-related" and of "business necessity" must be shown in an individualized assessment of Zei, or whether Zei's heart condition, per se, renders him unqualified. Central to this debate are two additional regulations: (1) 29 C.F.R. § 1630.15(e)—enacted by the Equal Employment Opportunity Commission—which provides a complete defense to an ADA claim: "It may be a defense to a charge of discrimination under [the ADA] that a challenged action is required or necessitated by another Federal law or regulation;"[2] and (2) 49 C.F.R. § 390.3(f)(2)—enacted by the Federal Highway Administration ("FHA")—which exempts state transportation agencies from complying with the FMCSRs: "the [FMCSRs] do not apply to ... Transportation performed by the Federal government, a State, or any political subdivision of a State, or an agency established under a compact between States that has been approved by the Congress of the United States."

Zei acknowledges that, in light of the defense in 29 C.F.R. § 1630.15(e), if the FMCSRs apply to the State, then the MTA will have a full defense against any discrimination action under the ADA as a matter of law. *See, e.g., Albertson's,* 527 U.S. at 570, 119 S.Ct. at 2171 (holding that an employer has not violated the ADA if they have an "unconditional obligation to follow the [FMCSRs]"). Yet, Zei argues, the FMCSRs do not

---

2. In light of 29 C.F.R. § 1630.15(e) there is no need to determine whether the ADA preempts the FMCSRs. In this context, the ADA and accompanying regulations explicitly accommodate and defer to other federal laws.

apply in this case because the State is not required by federal law to follow them, but rather voluntarily adopted the standards found in the regulations. Zei contends that the complete defense found in 29 C.F.R. § 1630.15(e) was created "solely on the need to relieve employers of the burden of complying with conflicting federal laws."

To support this assertion, Zei relies on the legislative history of the ADA which reflects congressional recognition "that a person with a disability applying for or currently holding a job subject to [FMCSRs] must be able to satisfy any physical qualification standard that is job related and consistent with business necessity in order to be considered a qualified individual with a disability under title I of this legislation." H.R.Rep. No. 101–485, pt. 2, at 57 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 339. Nevertheless, Zei argues, Congress questioned whether the FMCSRs were consistent with the ADA and therefore instructed that "the Secretary of Transportation will undertake a thorough review of [the FMCSRs] to ascertain whether the standards conform with current knowledge about the capabilities of persons with disabilities" and to "make any necessary changes within the two year period to bring such regulations into compliance with the law." *Id.* Thus, Zei concludes: "An employer who has voluntarily adopted the DOT Standards does not face the conflicting federal obligations which serve as the sole justification for deeming the DOT Standards a complete defense in the mandatory-adoption scenario. . . . Congress certainly did not envision that courts would 'limit application of the ADA as a matter of law' when there was no need to do so."

In Zei's opinion, when an employer voluntarily adopts the regulations, the FMCSRs "are merely a factor for a jury to consider in determining whether an ADA violation has occurred." *See Bates v. United Parcel Serv., Inc.,* 511 F.3d 974 (9th Cir.2007); *Cleary v. Fed. Express Corp.,* 313 F.Supp.2d 930 (E.D.Wis.2004); *Millage v. City of Sioux City,* 258 F.Supp.2d 976 (N.D.Iowa 2003); *Tinjum v. Atl. Richfield Co.,* 109 Wash.App. 203, 34 P.3d 855 (2001). Therefore, argues Zei, MTA is required to conduct an individualized assessment

to determine whether the FMCSRs are "job-related" and of "business necessity" as applied to Zei. *See Atkins v. Salazar*, 677 F.3d 667, 683 (5th Cir.2011).

To the contrary, MTA argues that the FMCSRs constitute qualification standards that as a matter of law satisfy the "job-related" and "business necessity" requirements of the ADA. *See Tate*, 268 F.3d 989; *Bay v. Cassens Transp. Co.*, 212 F.3d 969 (7th Cir.2000); *Prado v. Cont'l Air Transp. Co.*, 982 F.Supp. 1304 (N.D.Ill.1997); *Campbell v. Fed. Express Corp.*, 918 F.Supp. 912 (D.Md.1996). MTA argues that these cases treat the "failure to satisfy the DOT safety regulations as a disqualification from employment as a matter of law," and therefore, "Zei is ... mistaken in arguing that MTA was required to conduct an 'individualized assessment' to determine whether ... he could 'safely perform the duties' of an MTA bus driver."

Furthermore, relying on the history and purpose of the FMCSRs, MTA argues that it is irrelevant whether it was required by law to follow the regulations or whether it voluntarily adopted them. According to the MTA, the exemption of state governments from following the FMCSRs contained in 49 C.F.R. § 390.3(f)(2) was based solely on federalism concerns—about the division of responsibilities between the federal and state governments—not a desire to relieve the states of safely conducting their transportation operations. Thus, MTA argues, the "reliance on federalism concerns in creating the state exemption, and encouragement of states to adopt the safety regulations, demonstrates that DOT did not intend to differentiate between vehicles operated by public and private motor carriers."

To resolve this debate, and determine whether the FMCSRs satisfy the "job-related" and "business necessity" requirements of the ADA as a matter of law, we will trace the development of the cardiovascular disease qualification standard contained in the FMCSRs and the legislative history of the ADA. Then, we will also examine the development of the state government exemption from the FMCSRs and Con-

gress's subsequent legislative enactments to determine whether MTA's alleged "voluntary" adoption of the FMCSRs affects our holding.

*Legislative History of the ADA and Cardiovascular Disease Standard*

The FMCSR setting forth the qualification of drivers suffering from cardiovascular disease—49 C.F.R. § 391.41(b)(4)—was originally enacted in 1970. At that time, the FHA deemed it necessary to completely revise the "qualifications of drivers of commercial motor vehicles engaged in interstate or foreign commerce."[3] 34 Fed.Reg. 9080, 9080 (June 7, 1969). Explaining its purpose in making the revision, the FHA explained that "[a]ccident experience in recent years has demonstrated that . . . the good health of drivers are increasingly important factors in accident prevention[, and therefore, it is] necessary that criteria for determining whether individuals are qualified to drive commercial motor vehicles be upgraded."[4] *Id.* at 9081. Thus, the FHA sought to "substantially tighten the existing regulations by including guidelines for evaluation of persons in high-risk medical categories." *Id.*

---

**3.** The FMCSRs were initially enacted in 1937, in response to the Motor Carrier Act of 1935. 57 Fed.Reg. 37392, 37392 (Aug. 18, 1992). At that time, the regulations were under the control of the Interstate Commerce Commission. 59 Fed.Reg. 1366, 1366 (Jan. 10, 1994). The FMCSRs have since been amended multiple times. 59 Fed.Reg. 60319, 60319 (Nov. 23, 1994). The Department of Transportation was created in 1967, at which time it took over control of the FMCSRs. 59 Fed.Reg. at 1366. The authority was then vested in the Federal Highway Administration, *id.*, and today the FMCSRs fall under the control of the Federal Motor Carrier Safety Administration, Pub.L. No. 106–159, § 101, 113 Stat. 1748, 1750 (1999) (codified as amended at 49 U.S.C. § 113)—both of which are agencies within the Department of Transportation.

**4.** In the FHA's view, "it cannot reasonably be denied that adherence to improved driver qualification rules will play a vital part in the overall effort to improve motor vehicle safety" and "that the public interest in motor vehicle safety requires . . . insuring that drivers of modern, more complex vehicles can safely withstand the increased physical and mental demands that their occupation now imposes." 35 Fed.Reg. 6458, 6458 (Apr. 22, 1970).

In creating these guidelines for "high-risk medical categories," the FHA for the first time established qualifications for drivers of commercial motor vehicles who suffer from cardiovascular disease. Specifically, the revised FMCSRs provided that a driver is not qualified if he has a "current clinical diagnosis of myocardial infarction, angina pectoris, coronary insufficiency, thrombosis, or any other cardiovascular disease of a variety known to be accompanied by syncope, dyspnea, collapse, or congestive cardiac failure." 49 C.F.R. § 391.41(b)(4); *see also* 35 Fed.Reg. at 6463 (as amended by 35 Fed.Reg. at 17420).

When Congress subsequently enacted the ADA, it was well aware of the FMCSRs and its potential to disqualify individuals with disabilities. Yet, Congress did not abolish the FMCSRs. Instead, evident from examining the legislative history of the ADA, Congress viewed the FMCSRs as qualification standards that would satisfy the "job-related" and "business necessity" requirements of the ADA:

> With respect to covered entities subject to **rules** promulgated by the **Department of Transportation** regarding **physical qualifications for drivers** of certain classifications of motor vehicles, it is the Committee's intent that a person with a disability applying for or currently holding a job subject to these standards **must** be able to satisfy any **physical qualification standard** that is **job related** and consistent with **business necessity** in order to be considered a qualified individual with a disability under title I of this legislation.

> In light of this legislation, the Committee expects that within two years from the date of enactment (the effective date of title I of this legislation), the **Secretary of Transportation** will **undertake a thorough review of these regulations** to ascertain whether the standards conform with current knowledge about the capabilities of persons with disabilities and currently available technological aids and devices and whether such regulations are valid under this Act. The Committee expects that the agency will make any necessary changes within the two year period **to bring**

**such regulations into compliance with the law.** (Emphasis added).

H.R.Rep. No. 101–485, pt. 2, at 57 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 339. Indeed, because Congress fully understood that the FMCSRs would continue to exist as qualification standards under the ADA, Congress specifically instructed the Secretary of Transportation to perform a complete review of the FMCSRs and "bring such regulations into compliance with the law." In other words, to resolve any potential conflict between the requirements of a qualification standard under the ADA and the existing FMCSRs, Congress required the Secretary of Transportation to make sure that all existing FMCSRs were "job-related" and of "business necessity."

By 1992, the FHA had completed an entire review of the FMCSRs "to identify and eliminate any unnecessary regulatory burdens." 57 Fed.Reg. 37392, 37392 (Aug. 18, 1992). The FHA did not stop there. Taking a step further, the FHA determined it was necessary "to reconsider the underlying basis for all safety rules and to identify a performance-oriented regulatory structure that would enhance safety while minimizing the burdens placed on industry." *Id.* This review was "a comprehensive multi-year effort to re-create a body of safety rules and regulations that are (1) understandable, (2) enforceable, (3) capable of being implemented by industry, and above all, (4) consistent with highway safety." 59 Fed.Reg. 1366, 1366 (Jan. 10, 1994). The review focused on "the basic question[ ] of ... what is essential to improve motor carrier safety" and sought to "eliminate requirements not needed to carry out the regulatory program." *Id.* at 1367. In this process, the FHA specifically "reviewed the regulations in part 391" and decided to retain the cardiovascular disease qualification standard in 49 C.F.R. § 391.41(b)(4).[5]

---

5. In its review of Part 391, the FHA "determined that all requirements pertaining to the written examination and record of violations are unnecessary." 59 Fed.Reg. at 1367. In the final rule, FHA eliminated the regulations related to a written examination, but decided to keep

Our examination of the development of the FMCSRs and the ADA, tells us that both Congress and the Department of Transportation view the qualification standard of drivers suffering from cardiovascular disease as "job-related" and of "business necessity." As we learned, the regulation was created out of a recognition that "the good health of drivers" was an important factor in reducing the number of accidents and that the FMCSRs needed to be "substantially tighten[ed]," specifically regarding drivers "in high-risk medical categories." 34 Fed.Reg. at 9081. The legislative history divulges that Congress was aware of this qualification standard when adopting the ADA and specifically instructed the Secretary of Transportation to review the regulation for its compliance with the requirements of the ADA—i.e. for being "job-related" and of "business necessity." The Secretary of Transportation performed such a review, "eliminat[ing all] requirements not needed to carry out the regulatory program," and decided to retain the cardiovascular disease standard. 59 Fed.Reg. at 1367. Based on this careful, multi-step, review of the regulations by the DOT, we hold as a matter of law that 49 C.F.R. § 391.41(b)(4) satisfies the "job-related" and "business necessity" requirements of the ADA.

### The Exemption of State–Run Transportation from the FMCSRs

The question becomes then, whether MTA's alleged "voluntary" adoption of the FMCSRs changes this holding. In this regard, Zei cites 49 C.F.R. § 390.3(f)(2), which exempts state transportation from complying with the FMCSRs. Therefore, we will examine the creation of this exemption and any relevant subsequent acts of Congress to determine whether Congress sought to exempt states from the safety concerns of the FMCSRs, including the qualification of drivers suffering from cardiovascular disease in 49 C.F.R. § 391.41(b)(4).

After the cardiovascular disease standard was enacted, Congress continued to focus on improving the safety of com-

the regulations related to the record of violations. 59 Fed.Reg. at 60319–20.

mercial motor vehicles and the qualifications of the drivers. Congress passed the Motor Carrier Safety Act of 1984 "to promote the safe operation of commercial motor vehicles ... and to assure increased compliance with ... the commercial motor vehicle safety and health ... regulations...." Pub.L. No. 98–554, § 202, 98 Stat. 2832, 2832 (1984) (codified as amended at 49 U.S.C. § 31131). Congress found that (1) "it is in the public interest to enhance commercial motor vehicle safety and thereby to reduce highway fatalities, injuries, and property damage;" (2) "uniform commercial motor vehicle safety measures ... would reduce the number of fatalities and injuries;" and (3) "interested **State governments can provide valuable assistance to the Federal Government** in assuring that commercial motor vehicle operations are conducted safely and healthfully." *Id.* § 203(1)-(4), 98 Stat. at 2832 (codified as amended at 49 U.S.C. § 31131) (emphasis added).

To that end, Congress directed the Secretary of Transportation to issue regulations to ensure that "the physical condition of operators of commercial motor vehicles is adequate to enable them to operate such vehicles safely." *Id.* § 206(a)(3), 98 Stat. at 2834 (codified as amended at 49 U.S.C. § 31136).[6] Under this command, the Secretary proposed to add a new section of general applicability—Section 390.3—to "assist the general public and the motor carrier industry in determining when, and in which circumstances, the FMCSR[s] apply." 52 Fed.Reg. 26278, 26282 (July 13, 1987). Under the proposed rule-making of this new section, the FHA decided to exempt motor vehicles operated by the federal and state governments from the requirements of the FMCSRs. *Id.* Nevertheless, the FHA stated that, "[i]t is expected that governmental entities will comply with the FMCSR[s] to the greatest extent possi-

---

**6.** Furthermore, Congress declared that any "regulations pertaining to commercial motor vehicle safety which the Secretary issued before [this Act] shall, for purposes of this title, be deemed to be regulations issued by the Secretary under this section." Pub.L. No. 98–554, § 206(c), 98 Stat. 2832, 2834–35 (1984).

ble," and that "the [FHA] has encouraged their compliance with the FMCSR[s]." *Id.* The FHA then sought comment on this proposed exemption, as well as, "what additional steps the [FHA] might take to foster compliance with the regulations by governments." *Id.*

Under the final rule, the FHA retained the exemption for state governments, but reiterated its desire that states comply with the FMCSRs regardless:

> Motor vehicles operated by agencies of the Federal or the various State governments and/or their political subdivisions, in furtherance of their governmental or civic duties, have been administratively exempted from the safety regulations. However, the [FHA] has encouraged their compliance with the FMCSRs.

53 Fed.Reg. 18042, 18049 (May 19, 1988). The FHA explained that its decision to exempt state governments was driven largely by a Presidential Executive Order detailing "Federalism" concerns: "The purpose of the Executive Order is to restore the division of governmental responsibilities between the national government and the states. Federal action limiting the policy-making discretion of the states should be taken only where constitutional authority for the action is clear and certain...." *Id.* (citation and quotation marks omitted). The FHA stated that it decided to exempt state governments "[i]n light of these [federalism] considerations" and that "[t]his action is consistent with the Executive Order." *Id.* Nevertheless, in reiterating its desire that state governments follow these regulations, the FHA explained that if the transportation of state governments fell below an acceptable level of safety, the FHA would step in and regulate it: "The [FHA] will periodically review the safety performance of these operations. If it appears that these operations, or a segment of them, pose an unacceptable risk to public safety, the [FHA] will propose appropriate, necessary safety measures to improve these operations." *Id.*

Congress then created a state grant program called the Motor Carrier Safety Assistance Program. The goal of the program "is to ensure that the Secretary [of Transportation],

States, local government agencies, and other political jurisdictions work in partnership to establish programs to improve motor carrier, commercial motor vehicle, and driver safety." 49 U.S.C. § 31102(b)(1). The program seeks to accomplish this goal by having state governments "adopt[ ] and enforc[e] effective motor carrier, commercial motor vehicle, and driver safety regulations and practices consistent with Federal requirements." *Id.* § 31102(b)(1)(C). Providing a financial incentive to the states, the program specifically conditions the granting of funds on twenty-five requirements that must be met by the state government-one of which is "adopting and enforcing State safety laws and regulations that are compatible with the FMCSRs (49 CFR parts 390–397)." 49 C.F.R. § 350.201(a). In other words, although 49 C.F.R. § 390.3(f)(2) exempts state governments from complying with the FMCSRs, if a State wishes to receive federal grant money under the Motor Carrier Safety Assistance Program, the State must comply with the FMCSRs by adopting "compatible" state regulations.[7]

Maryland did just that. *See* Md.Code (1977, 2009 Repl. Vol.), § 25–111(f)(2)(ii) of the Transportation Article ("Any rule or regulation adopted pursuant to this subsection shall ... [d]uplicate or be consistent with the Federal Motor Carrier Safety Regulations contained in 49 C.F.R., Parts 390 through 399); COMAR 11.17.03.01 (requiring drivers of both

---

**7.** Explaining the Motor Carrier Safety Assistance Program, federal regulations make clear that state governments will ultimately have to comply with the FMCSRs if they wish to receive federal grant money:

The MCSAP is a Federal grant program that provides financial assistance to States to reduce the number and severity of accidents and hazardous materials incidents involving commercial motor vehicles (CMV). The goal of the MCSAP is to reduce CMV—involved accidents, fatalities, and injuries through consistent, uniform, and effective CMV safety programs.... The MCSAP also sets forth the conditions for participation by States and local jurisdictions and promotes the adoption and uniform enforcement of safety rules, regulations, and standards compatible with the Federal Motor Carrier Safety Regulations (FMCSRs) ... for both interstate and intrastate motor carriers and drivers.

49 C.F.R. § 350.101.

interstate and intrastate commercial motor vehicles to" "meet the physical qualifications of the Federal Motor Carrier Safety Regulations contained in 49 CFR 390–392"); 11.21.01.02 ("The federal motor carrier safety regulations contained in 49 CFR 40, 382, 383, 387, 390–393, 395–399, and 1572, as amended, are incorporated by reference...."). The Motor Vehicle Administration, in explaining why it adopted the FMCSRs at the direction of the General Assembly, stated: "This will improve public safety and integrate Maryland intrastate motor carrier safety regulations with those promulgated by the Federal Highway Administration for interstate operations." 21 Md. Reg. 1411, 1411 (Aug. 5, 1994). The Motor Vehicle Administration continued: "this action will bring State and local government commercial motor vehicle operators under the requirements of these regulations, and achieve compatibility with certain other federal motor carrier safety regulations." *Id.*

Reviewing the development of the state government exemption and subsequent grant program reveals a clear federal policy to induce states to adopt and apply the FMCSRs in setting qualification standards for its drivers of commercial motor vehicles. Although the FHA originally exempted state governments from the FMCSRs out of federalism concerns, the Supreme Court has long "held that a perceived Tenth Amendment limitation on congressional regulation of state affairs [does] not concomitantly limit the range of conditions legitimately placed on federal grants." *South Dakota v. Dole,* 483 U.S. 203, 210, 107 S.Ct. 2793, 2797, 97 L.Ed.2d 171 (1987). In other words, Congress's power to condition federal grant money allows it to achieve indirectly objectives which it may not have been able to accomplish through direct regulation.

That is precisely what happened in this case. Congress sought to ensure that state governments would follow the FMCSRs, and created a grant program that conditioned the receiving of federal money on the State explicitly adopting 49 C.F.R. parts 390–397—which includes the qualification standard of drivers suffering from cardiovascular disease. *See* 49 C.F.R. § 350.201(a). Maryland followed the wishes of Con-

gress and adopted state laws incorporating the FMCSRs and applying them to state-run transportation.[8]  In other words, Congress—well aware that 49 C.F.R. § 391.41(b)(4) satisfies the "job-related" and "business necessity" requirements of the ADA but that the states were exempt from requiring such a qualification standard—created direct financial incentives for states to act in accordance with 49 C.F.R. § 391.41(b)(4).

When the grant program is taken in combination with the FHA's repeated desire "that governmental entities will comply with the FMCSR[s]," and that it "has encouraged their compliance with the FMCSR[s]," 52 Fed.Reg. at 26282, we see a clear federal policy that state governments, although exempted, should adopt and implement the qualification standards of the FMCSRs.  Under such circumstances, we hold, as a matter of law, that 49 C.F.R. § 391.41(b)(4) satisfies the "job-related" and "business necessity" requirements of the ADA, and that Maryland may adopt, and the MTA may rightfully apply, this qualification standard.[9]

### *Reasonable Accommodation*

■ The only remaining inquiry to determine whether the MTA may properly apply this qualification standard is wheth-

---

**8.**  All of the out-of-state cases which Zei relies on—for the proposition that MTA was required to conduct an individualized assessment of Zei and thus judgement as a matter of law is inappropriate—fail to consider this combination of the legislative history of the ADA with the federalism concerns explaining the development of the FMCSRs and the Motor Carrier Safety Assistance Program.  Therefore, we find these cases unpersuasive.

**9.**  Zei also relies on 29 C.F.R. § 1630.15(e) which provides "a defense to a charge of discrimination under [the ADA] that a challenged action is required or necessitated by another Federal law or regulation."  In this regard, Zei's argument is slightly misplaced.  While MTA has applied a federally-created safety standard, MTA has not argued that it is entitled to judgment as a matter of law because it was required by federal law to fire Zei. Rather, MTA argues that it is entitled to judgment as a matter of law because the federally-created safety standard satisfies the "job-related" and "business necessity" requirements of the ADA. In this regard, MTA is not simply relying on the existence of another federal law, but rather, it argues that the federally-created qualification standard satisfies the ADA.

er "performance cannot be accomplished by reasonable accommodation." 42 U.S.C. § 12113. In arguing that a reasonable accommodation could have been made in this case, Zei explains that one definition for a reasonable accommodation includes an "appropriate adjustment or modifications of ... policies." 42 U.S.C. § 12111(9)(B). In other words, Zei asserts "that MTA could have reasonably accommodated Zei by modifying its policy relating to DOT Standards and adopting a[n] alternative, less discriminatory criterion."

Relying on *Myers v. Hose,* 50 F.3d 278 (4th Cir.1995), the MTA responds that Zei's "undeniable medical condition precludes a finding that he is able to perform the essential functions of operating an MTA bus with or without reasonable accommodation." In *Myers,* the Fourth Circuit held that a bus driver for Frederick County who suffered from chronic heart disease could not satisfy the essential functions of a bus driver which "is to operate his motor vehicle in a timely, responsible fashion ... in a way that does not threaten the safety of his passengers or of other motorists." *Id.* at 282. The Fourth Circuit reasoned that no reasonable accommodation could be made because "the County cannot reasonably be expected to alter the ... specifications of [the bus driver's] particular post." 50 F.3d at 282 n. 2. The Fourth Circuit explained: "Such standard types of accommodation would be ineffectual in remedying the basic disparities between [the bus driver's] medical condition and the legitimate physical criteria for employment as a bus driver. The sole change in circumstances that would enable [the bus driver] to operate public vehicles safely would be a reversal of his medical condition." *Id.*

We agree with the MTA. The ADA requires only reasonable accommodations, not unreasonable ones. *Id.* at 283. As we have reviewed, Congress, the DOT, Maryland's General Assembly, and Maryland's Motor Vehicle Administration view the FMCSRs as essential to the safety of our highways and crucial in reducing the number of accidents involving commer-

cial motor vehicles.[10] The regulations governing the physical qualifications of drivers are both "job-related" and of "business necessity." We agree with the Fourth Circuit, therefore, that it would not be reasonable to force the MTA to lower its standards regarding minimal qualifications for commercial motor vehicle drivers. *Id.* at 282 n. 2. Such an accommodation would do nothing to remedy the deficiency between Zei's medical condition and the MTA's legitimate standards to qualify for employment as a bus driver. *Id.*

## CONCLUSION

We hold, that as a matter of law, the MTA's use of the federally-created qualification standard in 49 C.F.R. § 391.41(b)(4) governing drivers suffering from cardiovascular disease satisfied the ADA's requirements of being "job-related" and of "business necessity," and that "performance cannot be accomplished by reasonable accommodation." 42 U.S.C. § 12113. Because Zei failed to meet this properly imposed qualification standard, he is not a "qualified individual" under the ADA.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS IN THIS COURT TO BE PAID BY PETITIONER.**

## *ORDER*

MARY ELLEN BARBERA, Chief Judge.

The Court, having considered the motion for reconsideration and the answer filed thereto, in the above captioned case, it is this 16th day of August, 2013

---

**10.** As the Tenth Circuit explained the DOT's expertise in this area:

Nevertheless, the views of an agency such as DOT implementing a regulatory scheme designed to ensure the safety of our nation's highways " 'constitute a body of experience and informed judgment' " to which employers may properly resort for guidance. We hesitate to second guess a legitimate business judgment on the part of DOT and its covered employers as to the necessary qualifications of CMV operators.

*Tate v. Farmland Indus., Inc.,* 268 F.3d 989, 994–95 (10th Cir.2001) (alterations in original) (citations omitted).

ORDERED, by the Court of Appeals of Maryland, that page one, paragraph one of the opinion filed on May 20, 2013 shall be modified to read as follows:

In this case, we are asked to determine whether the Maryland Transit Administration ("MTA") complied with the Americans with Disabilities Act ("ADA") when it adopted and applied a federally-created safety regulation governing the physical qualifications of drivers of commercial motor vehicles. Specifically, the United States Department of Transportation ("DOT") has determined that an individual is not qualified to drive a commercial motor vehicle if that individual currently suffers from certain cardiovascular diseases. The MTA followed the lead of the federal government and adopted the same standard for its bus operators. We are tasked with determining whether MTA violated the ADA by firing Anthony Zei, a bus operator who failed to meet this standard.

ORDERED that page twelve, paragraph three, sentence one shall be modified to read as follows:

Our examination of the development of the FMCSRs and the ADA, tells us that the qualification standard of drivers suffering from cardiovascular disease is "job-related" and of "business necessity."

ORDERED that page eighteen, sentence one shall be deleted.

ORDERED that page eighteen, third paragraph, sentences one through three shall be modified to read as follows:

That is precisely what happened in this case. Congress sought to ensure that the FMCSRs applied to intrastate transportation, as well as interstate, and thus, created this grant program which conditioned the receiving of federal money on the State explicitly adopting 49 C.F.R. parts 390–397–which includes the qualification standard of drivers suffering from cardiovascular disease. *See* 49 C.F.R. § 350.201(a). Maryland followed the wishes of Congress and adopted state laws incorporating the FMCSRs.

ORDERED that, excepting the aforesaid amendments, the Motion for Reconsideration is DENIED.