REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 712

September Term, 2014

---

TRACEY L. ADKINS

v.

PENINSULA REGIONAL MEDICAL
CENTER

---

Leahy,
Friedman,
Thieme, Raymond G., Jr.
  Ret'd, Specially Assigned

JJ.

---

Opinion by Leahy, J.

---

Filed: July 30, 2015

In this appeal, we address an employer's duty under the Maryland Fair Employment Practices Act ("MFEPA"), Maryland Code (1984, 2014 Repl. Vol.), State Government Article ("SG") §§ 20-601 to 20-609, to reasonably accommodate a disabled employee seeking reassignment to another position for which he or she is otherwise qualified. In 2011, the employee in this case, Appellant Tracey L. Adkins, learned that she needed surgery to remedy a tear and deformation in her left hip. At the time, Ms. Adkins was employed by Appellee Peninsula Regional Medical Center ("PRMC") as a storekeeper. Following her surgery, Ms. Adkins could no longer perform the largely physical tasks of the storekeeper position because her surgeon placed her on a sedentary work restriction. Ms. Adkins exhausted her initial leave to which she was entitled under the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.* PRMC then granted Ms. Adkins 14 weeks of additional FMLA leave, and advised her to begin applying for other positions. Meanwhile, PRMC filled Ms. Adkins's storekeeper position, and Ms. Adkins began applying to numerous vacant positions at PRMC. She was rejected from each one.

In February 2012, following expiration of her extended leave, PRMC terminated Ms. Adkins's employment. PRMC also rejected Ms. Adkins from additional positions to which she applied following termination. Ms. Adkins then filed a lawsuit against PRMC in February 2013 in the Circuit Court for Wicomico County, alleging disability discrimination and failure to accommodate under the MFEPA. The case did not proceed to trial because the circuit court granted PRMC's motion for summary judgment based on its conclusion that although Ms. Adkins had a disability within the meaning of the

MFEPA, she was not otherwise qualified for any of the vacant positions to which she applied and did not request an accommodation from PRMC. Ms. Adkins filed a timely appeal,[1] presenting seven questions for our review, which we have consolidated and rephrased for clarity:

I. Did the circuit court err in granting summary judgment in favor of PRMC based on its conclusion that there was no genuine dispute of material fact regarding whether Ms. Adkins was an otherwise "qualified individual with a disability" or whether she requested an accommodation?

II. Did the circuit court err by failing to address Ms. Adkins's argument that PRMC failed to engage Ms. Adkins in an "interactive process" to determine a reasonable accommodation for her disability?

III. Did the circuit court err in failing to conclude that the demand by PRMC's Director of Materials Management, Scott Phillips, that Ms. Adkins be returned to full duty constituted a "100 percent healed" requirement that amounted to per se disability discrimination?

IV. Did the circuit court err when it denied Ms. Adkins's motion to compel and the amendment thereto?

We hold that when an employee with a disability is no longer able to perform the essential functions of a formerly-held position, the employee may still be a "qualified individual with a disability" under MFEPA entitled to reassignment to a vacant position if the employee can establish that he or she can perform the essential functions of that position, with or without reasonable accommodation. We also hold that once an employer is on notice that an employee has become disabled, the employer is required to assess the capabilities of the disabled employee to determine whether the employee is

---

[1] The court granted PRMC's Motion for Summary Judgment in an order entered on May 20, 2014, and Ms. Adkins filed her notice of appeal on June 11, 2014.

"otherwise qualified" for the same or another vacant position, and to determine what reasonable accommodation may be made without undue hardship to the employer, including reassignment. We conclude that when viewed in the light most favorable to Ms. Adkins, the evidence contained in the record on motion for summary judgment reflected genuine disputes of material fact regarding whether Ms. Adkins: (1) provided adequate notice to PRMC of her disability and need for an accommodation; (2) was assessed by PRMC to determine whether she could perform the essential functions of another vacant job; (3) could perform the essential functions of the inventory control coordinator position for which she applied; and (4) could perform the essential functions of another vacant job at PRMC. In addition, although we hold the circuit court did not abuse its discretion in denying Ms. Adkins's motion to compel the personnel files she requested, we conclude that the court did abuse its discretion by denying Ms. Adkins's motion to compel production of relevant vacant positions at PRMC available during the time period in question, as this information was directly relevant to Ms. Adkins's *prima facie* case alleging failure to accommodate. We reverse in part and affirm in part.

## BACKGROUND

The instant case arrives in this Court following the circuit court's grant of summary judgment; therefore, the following facts are assembled from the pleadings and documents attached to the summary judgment motion and response. We view the evidence in the light most favorable to Ms. Adkins as the nonmoving party. *Jones v. Mid-Atl. Funding Co.*, 362 Md. 661, 676 (2001).

3

A. Ms. Adkins's Employment at PRMC

Located in Salisbury, Maryland, PRMC is an advanced tertiary care facility that houses 288 licensed beds and is staffed by approximately 2,669 individuals. Ms. Adkins began her career at PRMC in March 2005 as a storekeeper in the Materials Management Department, which is, in part, responsible for inventorying and stocking medical supplies and equipment. In this role, Ms. Adkins was responsible for delivering supplies to various floors of the hospital, organizing supplies in the supply room, and checking expiration dates of materials. Six months later, she was transferred to the Heart Center Inventory Control, more commonly known as the "Cath Lab," as an inventory control assistant. This position was also in the Materials Management Department. Ms. Adkins held this position for several years, until September 2010, when the position was "cut," and she was transferred back to the storekeeper position. She retained this position until her termination on February 25, 2012—the event which spawned the underlying lawsuit.

B. The Events Leading up to Surgery

At some point during her tenure as storekeeper, Ms. Adkins began to experience pain in her hip. This pain intensified in early April 2011, when Ms. Adkins, while at her home, stood up and felt a painful pull in her groin area. She sought treatment at PRMC's emergency room and took a few days off from work. When she returned to work, Ms. Adkins continued to experience significant pain, but still managed to complete her tasks. After a return trip to the emergency room on May 10, 2011, her doctor advised that she should stop working. Determined to keep working, on May 23 she received a steroid injection in her hip, which alleviated the pain, and she returned to her post the next day.

4

Ms. Adkins's superiors, Scott Phillips (director of materials management services) and Pat Stevenson (control stores inventory control coordinator), were apprised of these events.

Despite the steroid treatments, Ms. Adkins's pain did not subside. She was ultimately diagnosed with a tear in the joint of her left hip as well as a hip deformation in her hip socket. She was scheduled to have surgery—an arthroscopic acetabuloplasty, labral repair, and femoroplasty—by orthopedic surgeon Jason Scopp, M.D., on August 25, 2011. In anticipation of her surgery, Ms. Adkins notified her supervisors and filled out paperwork (dated July 21, 2011, but received by PRMC on August 11, 2011) to obtain leave under the FMLA. Her paperwork indicated that her leave would begin on August 25, 2011, and that she would return to work on or about October 6, 2011.

In a letter dated August 11, 2011, PRMC approved Ms. Adkins's FMLA leave request. The letter further explicated Ms. Adkins's rights under the FMLA. The letter explained that her approved 12-week leave under the FMLA would expire on November 17, 2011, and that so long as she returned by that date, she would be returned to her job or an equivalent one. The letter also advised that she would have to obtain a work evaluation from the Employee Health Office before resuming work.

C. Ms. Adkins Undergoes Surgery and Begins 12-Week FMLA Leave

Ms. Adkins continued working full-time until she underwent surgery in August 2011 and began her 12-week FMLA leave.[2] Unfortunately, her pain intensified following

---

[2] Ms. Adkins began applying for other positions at PRMC during the months (continued . . . )

5

the surgery, and her doctors advised that the time for recovery could range from six months up to a year.

On October 3, 2011, while still out on FMLA leave, Ms. Adkins met with James Bunk, another superior, who was the supply chain operations manager of the Materials Management Department. She advised him that she was meeting her surgeon on October 10 for a follow-up and that she hoped to learn, at that time, when she could return to work. Following the appointment, Ms. Adkins received a letter from her surgeon advising that she would be unable to return to work until November 7, 2011. Ms. Adkins delivered this documentation to PRMC's Employee Health Office and Mr. Bunk.

On November 7, 2011, Ms. Adkins returned to work as scheduled and met with a nurse at the Employee Health Office. There, Ms. Adkins advised that she would be unable to fulfill her job responsibilities on that day. She explained that she experienced increased pain when bending, lifting, and squatting, and that she would not be able to stand for long periods of time. PRMC, in turn, did not clear Ms. Adkins for work. The "Employee Charting Note" for this date confirmed that "all parties" agreed that Ms. Adkins could not return to work. It also reflected that Ms. Adkins had "been educated on FMLA and to start looking at job postings" and that Ms. Adkins reported having applied to the "core tech position."

_____

leading up to her surgery, including: Aide – Physical Therapy; CNA Trainee; Code Abstractor II; Coordinator – Emergency Admitting; Parking Attendant; Patient Service Rep – Medical Group; Registrar – Outpatient; Representative – Billing/Collection – Medical Group (two positions); Representative – Patient Account; and Service Desk IT-Technician (two positions).

Three days later, on November 10th, Ms. Adkins returned to her doctor and received a medical report form indicating she could return to work under "light duty," meaning that she was capable of performing "[s]edentary [w]ork: [l]ifting 10 pounds maximum and occasionally lifting and/or carrying small articles and occasional walking or standing." That same day, she brought the form to the Employee Health Office, which advised her that "the unit could not accommodate her restrictions." Ms. Adkins testified during her deposition that Employee Health informed her that she would "need[] to be released [for] full duty [in order] to be able to do [her] position not sedentary." Ms. Adkins admitted to her supervisors that she could not do her current storekeeper job with sedentary restrictions, and advised that she was unable to be released for work in that job.

After this meeting, Ms. Adkins began applying for different jobs that she believed were sedentary. Following her surgery and before her termination, Ms. Adkins applied to the following positions: Clerk-Postal; Monitor Technician; Patient Service Rep–Medical Group; Operating Room Core Technician; CNA-Trainee; Code Abstractor I; Patient Service Rep-Medical Group (several vacancies); Representative– Billing/Collection– Medical Group; and Technician–Core. She also e-mailed Mr. Phillips asking to be considered for an inventory control coordinator position. She was not hired for any of these positions.

D. Ms. Adkins's Leave Expires, and She Is Terminated

On or around November 17, 2011—the day Ms. Adkins's 12-week FMLA leave was set to run out—PRMC extended her another 14 weeks of FMLA leave until February 2012. At the same time, PRMC encouraged her to apply for other positions, although

7

specific positions were not identified. Ms. Adkins also learned that her storekeeper position had been filled.[3]

On January 12, 2012, Ms. Adkins went back to her doctor for an appointment and received a doctor's note that maintained the "light duty" work restrictions.[4] On February 14, 2012, PRMC's Benefits Manager notified Ms. Adkins in a letter that she was only entitled, under PMRC's policy, to a leave of absence for six months per year, and that her leave would expire on February 25, 2012. In response, Ms. Adkins inquired about her pension but did not ask about employment.

Ms. Adkins was ultimately terminated on February 25, 2012. Following termination, Ms. Adkins applied to four more positions: Registrar-Emergency Admittance; Receptionist; Representative–Billing/Collection-Medical Group; and Representative–Patient Account. She was not hired for any of these positions.

E. Ms. Adkins Sues PRMC for Disability Discrimination and Failure to Accommodate

On February 1, 2013, Ms. Adkins filed a three-count complaint against PRMC in the Circuit Court for Wicomico County under the MFEPA, alleging disability

---

[3] It appears that during her initial 12-week FMLA leave, a temporary employee filled Ms. Adkins's storekeeper position. The position was permanently filled following the expiration of her 12-week leave.

[4] The date on this note reflected the year of 2011, but all parties agreed that the actual year was 2012. On the medical report form, the doctor had checked both the box indicating that Ms. Adkins "may return to pre-injury job without restriction" **and** the box indicating there was a restriction; namely, that she was still limited to performing sedentary work, as reflected by the November 10, 2011, medical report. Ms. Adkins understood this note to mean that she was still limited to sedentary work.

discrimination based on an actual disability, disability discrimination based on being regarded by the defendant as having a physical impairment, and failure to accommodate disability.[5] PRMC filed an answer on May 3, 2013. During the ensuing discovery process, Ms. Adkins sought production of various documents—including all job vacancies at the time she was looking for a position and the personnel files of core technician employees—and PRMC objected. This prompted Ms. Adkins to file a motion to compel on December 25, 2013 (as well as an amendment thereto on January 21, 2014).

PRMC filed a motion for summary judgment on January 6, 2014. Several days later, on January 9, 2014, Ms. Adkins filed an amended complaint, and PRMC filed an answer on January 24, 2014. In light of Ms. Adkins's amended complaint, PRMC filed an amended motion for summary judgment on March 21, 2014, which is the subject of the instant appeal.

In its motion, PRMC argued, *inter alia*, that Ms. Adkins did not have a disability; that she was not qualified to perform the essential functions of her last job or the positions to which she applied; and that no reasonable accommodation was available. PRMC attached a number of exhibits, including Ms. Adkins's deposition; job descriptions for positions to which she applied; and deposition excerpts of PRMC employees, including Ms. Adkins's supervisors, human resources personnel, and benefits

---

[5] Ms. Adkins had also filed a complaint with the United States Equal Employment Opportunity Commission on July 27, 2012. As explained further *infra*, Ms. Adkins, as an employee alleging disability discrimination in the workplace, had the option of filing a civil action in the circuit court following her filing of a complaint with the EEOC. *See* SG § 20-1013.

personnel. In her response filed on April 7, 2014, Ms. Adkins maintained, *inter alia*, that she had a disability; that she was a qualified individual with a disability; and that PRMC failed to engage in an interactive process to assist her in finding a proper accommodation following her sufficient notice that she needed an accommodation. She attached a number of exhibits, including her own affidavit, medical documents, and various deposition excerpts from PRMC employees.

The circuit court held a hearing on April 30, 2014, with three motions before it: (1) PRMC's motion to strike Ms. Adkins's amended complaint, (2) Ms. Adkins's motion to compel, and (3) PRMC's motion for summary judgment. On the record at the hearing, PRMC withdrew its motion to strike Ms. Adkins's amended complaint, and, at the close of the hearing, the court denied Ms. Adkins's motion to compel. The court held the motion for summary judgment *sub curia*.

In an order and opinion dated May 19, 2014 (entered May 20), the court granted summary judgment in favor of PRMC. As to Count 1 (discrimination based on actual disability), the court concluded that there was no genuine dispute of material fact that Ms. Adkins failed to demonstrate a *prima facie* case under the three prong test enunciated in *Ridgely v. Montgomery County*, 164 Md. App. 214, 232 (2005): (1) that she had a disability; (2) that notwithstanding the disability, she was otherwise qualified for the employment, with or without reasonable accommodation; and (3) that PRMC excluded her from employment solely due to her disability. The court concluded that Ms. Adkins's hip injury was a "physical impairment" that substantially limited her performance of major life activities, thereby meeting the definition of disability, and that no reasonable

10

trier of fact could conclude that she was not disabled. However, the court ruled that no rational trier of fact could conclude that Ms. Adkins was "otherwise qualified":

> The essential functions of the Storekeeper position, as well as the various other opportunities for which the Plaintiff applied, involved physical demands beyond her capabilities. The Plaintiff could not execute the jobs' requirements, including protracted standing, walking, bending, and lifting.

The court further concluded that "no reasonable accommodation was available for her" and that it was "undisputed that [Ms. Adkins] never approached [PRMC] about any specific reasonable accommodations that would enable her to perform the essential duties of her employment." The court hypothesized that even if it was PRMC's duty to initiate implementation of a reasonable accommodation, Ms. Adkins failed to identify one that could have been available. Based on its conclusions as to the first and second prongs, the court did not address the third prong.

The court also did not find any genuine dispute of material fact regarding Count 2 (being "regarded as" disabled) given its conclusion that the evidence demonstrated that Ms. Adkins was, in fact, disabled.[6] As to Count 3 (failure to accommodate), the court reiterated that it is the employee's burden to request an accommodation and emphasized that "neither party has shown a specific reasonable accommodation that would allow [Ms. Adkins] to fulfill her essential duties of employment." Accordingly, the court granted summary judgment in favor of PRMC. This appeal ensued.

We include additional facts in the discussion relevant to the issues there examined.

---

[6] The court stated that it would "dismiss Count # 2 with prejudice"; however, the order simply entered judgment in favor of PRMC. In any event, Ms. Adkins does not challenge the court's ruling as to Count 2 on appeal.

11

## DISCUSSION

## I.

## A. <u>Standard of Review</u>

Ms. Adkins contends that the circuit court erred in granting PRMC's motion for summary judgment. Maryland Rule 2-501 governs motions for summary judgment and provides that summary judgment is proper "if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." Md. Rule 2-501(a). The nonmoving party's written response must "(1) identify with particularity each material fact as to which it is contended that there is a genuine dispute and (2) as to each such fact, identify and attach the relevant portion of the specific document, discovery response, transcript of testimony . . . , or other statement under oath that demonstrates the dispute." Md. Rule 2-501(b).

"The purpose of the summary judgment procedure is not to try the case or to decide the factual disputes, but to decide whether there is an issue of fact, which is sufficiently material to be tried." *Mid-Atl. Funding Co.*, 362 Md. at 675 (citations omitted). Thus, "[i]n reviewing the grant of a summary judgment motion, we are concerned with whether a dispute of material fact exists," *id.* (citations omitted), and our review is *de novo*, *MAMSI Life & Health Ins. Co. v. Callaway*, 375 Md. 261, 278 (2003) (citing *Green v. H & R Block, Inc.*, 355 Md. 488, 502 (1999); *Heat & Power v. Air Prods.*, 320 Md. 584, 590-92 (1990)). We review the same record and issues of law as the circuit court and are "tasked with determining whether the trial court reached the

correct result as a matter of law." *Id.* (citing *Tyma v. Montgomery Co.*, 369 Md. 497, 504 (2002); *Murphy v. Merzbacher*, 346 Md. 525, 530-31 (1997)).  We view the evidence in the light most favorable to, and draw all inferences in favor of, Ms. Adkins as the nonmoving party.  *Mid-Atl. Funding Co.*, 362 Md. at 676.

## B. <u>The Development of Legislation Banning Disability Discrimination in the Workplace</u>

Title VII of the Civil Rights Act of 1964 established a broad prohibition of workplace discrimination on the grounds of race, color, religion, sex, and national origin. Pub. L. No. 88-352, 78 Stat. 253 (1964) (codified as amended at 42 U.S.C. §§ 2000e *et seq.*).  Although Title VII did not encompass disability within its scope, Congress thereafter extended Title VII's ban of discriminatory workplace practices to include disability with its enactment of the Rehabilitation Act of 1973.  Pub. L. No. 93-112, 87 Stat. 355 (1973) (codified as amended at 29 U.S.C. § 790 *et seq.*).  This Act protects federal executive branch employees, *see* 29 U.S.C. § 791, and employees of federal contractors and subcontractors with contracts exceeding $10,000, *see* 29 U.S.C. § 793.  It also prohibits discrimination in programs or activities that receive federal financial assistance or are conducted by an executive federal agency or the U.S. Postal Service. *See* 29 U.S.C. § 794.

Less than three decades later, Congress enacted the Americans with Disabilities Act of 1990 ("ADA"), which became effective on July 26, 1992.  Pub. L. No. 101-336, § 108, 104 Stat. 327 (1990) (codified as amended at 42 U.S.C. § 12101 *et seq.*).  The ADA expanded the applicability of anti-discrimination laws regarding disability to more

employers than were covered by the Rehabilitation Act, including employers that employ 15 or more individuals over a 20-week period, labor organizations, and joint labor-management committees as "covered entities." *See* 42 U.S.C. §§ 12111(2), (5), & 12212(a). Specifically, the ADA establishes that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In light of the case law that began to shape the application of the ADA, Congress made significant changes with its enactment of the ADA Amendments Act of 2008,[7] which became effective on January 1, 2009. Pub. L. No. 110-325, 122 Stat. 3553 (2008) (codified at 42 U.S.C. § 12101). Most notably, the amendments broadened the definition of "disabled" and broadened the scope of protection under the ADA to include not only those persons with actual disabilities, but also those perceived or "regarded as" being disabled.[8] *See Meade v. Shangri-La P'ship*, 424 Md. 476, 489-91 (2012)

---

[7] The ADA Amendments Act is commonly referred to as the "ADAA." To the extent that we reference the ADA as well as the ADAA in this opinion, we refer to both enactments collectively as the "ADA" unless otherwise noted.

[8] Under the federal definition, disability means "a physical or mental impairment that substantially limits one or more major life activities"; "a record of such an impairment"; or "being regarded as having such an impairment." 42 U.S.C. § 12102(1). "Major life activities" include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." § 12102(2)(A). They also include "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and (continued . . . )

(recognizing that Congress explicitly repudiated a prior, narrow definition of "disability" by passing the ADAA in 2008).

Following Congress's lead, the Maryland General Assembly enacted laws prohibiting discrimination on the basis of disability. Beginning in 1965, Maryland passed the Maryland Fair Employment Practices Law, codified at Article 49B, patterned after federal law, and amended it to comport with federal law as it was updated. *Haas v. Lockheed Martin Corp.*, 396 Md. 469, 503-04 (2007) (Battaglia, J., dissenting). Thus, like the federal Civil Rights Act of 1964, Maryland law did not initially cover disability discrimination. It was not until 1974, around the time Congress enacted the Rehabilitation Act, that the General Assembly amended Article 49B's ban on discrimination to include "physically or mentally handicapped persons." 1974 Md. Laws, ch. 601. The General Assembly changed the "handicap" terminology to "disability," without substantive change in the definition thereof, in 1999. 1999 Md. Laws, ch. 60 (H.B. 59).

Initially, employees who alleged disability discrimination in the workplace were required to file a complaint with the Maryland Commission on Human Relations, which would, in turn, investigate the complaint and ultimately decide whether to bring a civil action on the employee's behalf upon a finding of probable cause that an unlawful

---

reproductive functions." § 12102(2)(B). The provision explicitly provides that the definition of disability "shall be construed in favor of broad coverage of individuals under this chapter" and that "[t]he term 'substantially limits' shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008." § 12102(4)(A)-(B).

15

employment practice occurred. Md. Code (1957, 2003 Repl. Vol), Art. 49B, §§ 9A-12. In 2007, however, the General Assembly amended the enforcement provisions to give these employees the option of filing a civil action against the employer themselves after exhausting their administrative remedies.[9] 2007 Md. Laws, chs. 177, 176.

In 2009, the disability provisions that were formerly contained in Article 49B (§§ 14-18) were re-codified in Title 20, the Human Relations Title of the State Government Article without substantive change. Revisor's Note to 2009 Md. Laws, ch. 120, § 2; SG §§ 20-601 to 20-609. Later that year, however, the General Assembly made various substantive amendments to the Code. For example, just as the ADAA expanded the ADA's definition of "disability", the General Assembly also expanded the definition to include those persons having a record of a physical or mental impairment as well as those who are "regarded as" having a physical or mental impairment. 2009 Md. Laws, ch. 299, § 1 (S.B. 670). The Code of Maryland Regulations ("COMAR") § 14.03.02 *et seq*. further explicates the statutory scheme.

Also in 2009, and most relevant to the matter before us, the General Assembly added explicit language making an employer's failure or refusal to make a reasonable accommodation for an otherwise qualified employee known to have a disability, a

---

[9] An employee must exhaust the administrative remedies found in SG § 20-1013(a), which provides that the employee may bring a civil action in his or her own right so long as: (1) he or she "initially filed a timely administrative charge or a complaint under federal, State, or local law alleging an unlawful employment practice"; (2) "at least 180 days have elapsed since the filing of the administrative charge or complaint"; and (3) "the civil action is filed within 2 years after the alleged unlawful employment practice occurred."

separate ground for an illegal employment practice. *Id.* The General Assembly carefully qualified this obligation, as did Congress under the ADAA,[10] to say that an employer is not required "to reasonably accommodate an employee's . . . disability if the accommodation would cause undue hardship on the conduct of the employer's business." SG § 20-603(2); 2009 Md. Laws, ch. 299, § 1. (S.B. 670). To determine whether an undue hardship exists, factors to be considered include: "(1) The nature and cost of the accommodation needed; (2) The financial resources of the covered entity, and any parent corporation if applicable; (3) The size of the business with respect to the number and type of facilities; (4) The type of business or program, including the composition and structure of the work force; (5) The ability of the covered entity to conduct business or operate programs with the accommodation; (6) The effect of the accommodation on other employees' performance; and (7) Legitimate safety concerns." COMAR § 14.03.02.06(B).

## C. **Ms. Adkins's Disability Discrimination Claims**

Ms. Adkins asserted three counts in her complaint: (1) disability discrimination based on actual disability; (2) disability discrimination based on being "regarded as" having a physical impairment; and (3) failure to accommodate. The circuit court granted summary judgment in favor of PRMC as to all three counts, but Ms. Adkins only disputes the rulings as to disability discrimination based on an actual disability (Count 1), and

---

[10] *See* 42 U.S.C. § 12112.

17

failure to accommodate (Count 3). Notably, PRMC does not challenge the court's conclusion that Ms. Adkins is an individual with a disability on appeal.

In Maryland, it is unlawful for a covered employer to "fail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment" based on his or her "disability [that is] unrelated in nature and extent so as to reasonably preclude the performance of the employment." SG § 20-606(a)(1)(i); *see also* COMAR § 14.03.02.04(A)(2) (establishing various forms of unlawful employment discrimination against "a qualified individual with a disability," including "[h]iring, upgrading, promotion, tenure, demotion, transfer, layoff, termination, right of return from layoff, and rehiring"). COMAR expounds on the "reasonable accommodation" requirement:

> [a] covered entity (1) [s]hall make a reasonable accommodation to the known physical or mental limitations of a qualified individual with a disability; (2) [i]s not required to provide an accommodation, if it demonstrates that the accommodation would impose undue hardship on the operation of its business or program; and (3) [m]ay not deny an employment opportunity to a qualified individual with a disability, if the basis for the denial is the need to accommodate the individual's physical or mental limitations, and this accommodation, if attempted, would be reasonable.

COMAR § 14.03.02.05(A).

As made plain by the language of these provisions, an employee must be "a qualified individual with a disability" to prevail in either a disability discrimination claim under SG § 20-606(a)(1) or a failure-to-accommodate claim under SG § 20-606(a)(4). Thus, before turning to the specific elements for each of Ms. Adkins's two claims, we

18

consider the meaning of a "qualified individual with a disability" in the context of this case.

Qualified Individual with a Disability

A "qualified individual with a disability" is "an individual with a disability who: (a) *[w]ith* or *without* reasonable accommodation can perform the essential functions of *the job in question*; or (b) [i]s otherwise qualified for the benefit, term, condition, or privilege of employment at issue." COMAR § 14.03.02.02(B)(10) (emphasis added). As the party needing to present a *prima facie* case, the employee-plaintiff bears the initial burden of showing that he or she is a "qualified individual with a disability." *See Hawkins v. Rockville Printing & Graphics, Inc.*, 189 Md. App. 1, 11 (2009); *Gaither v. Anne Arundel Cnty.*, 94 Md. App. 569, 583 (1993); *Md. Comm'n on Human Relations v. Mayor & City Council of Balt.*, 86 Md. App. 167, 176 (1991); *see also Caire v. Conifer Value Based Care, LLC*, 982 F. Supp. 2d 582, 599 (D. Md. 2013).

In the case *sub judice*, it is undisputed that, *without* a reasonable accommodation, Ms. Adkins was no longer capable of performing the essential functions of "the job in question"—her then-current position of storekeeper. In her deposition, Ms. Adkins ranked the position as a ten on a scale from one to ten regarding its level of physical demand, and the uncontroverted evidence in the record reflects that Ms. Adkins confirmed she was unable to perform her storekeeper duties following surgery and expiration of FMLA leave.

Whether Ms. Adkins could "perform the essential functions of the job" *with* a reasonable accommodation, however, is the subject of dispute in this case. *Gaither*, 94

Md. App. at 583 ("Establishing that one is 'otherwise qualified' for a job necessarily entails a consideration of whether one would be qualified if his [disability] were accommodated by the employer." (citing *Md. Comm'n on Human Relations*, 86 Md. App. at 174)); *cf. Zei v. Md. Transit Admin.,* 433 Md. 254, 271 (2013) (considering whether employee could be a qualified individual with a disability under the ADA by being offered a reasonable accommodation that could permit him to perform his job), *cert. denied,* 134 S. Ct. 942 (2014). Under Maryland law, a "reasonable accommodation" may include "job restructuring"; "[r]eassigning or transferring an employee to a vacant position, light duty job, different work location, or other alternative employment opportunity which is available under the employer's existing policies or practices"; or "[m]aking reasonable modifications in the covered entity's rules, policies, and practices if the modification may enable an applicant or employee with a disability to perform the essential functions of the job." COMAR § 14.03.02.05(B)(3), (5), (11).

Here, Ms. Adkins does not contend that PRMC could have altered or restructured her storekeeper position to accommodate her disability; instead, she contends that PRMC could have reassigned her to a vacant position.[11] When reassignment or transfer is

---

[11] Ms. Adkins also argues that PRMC could have provided her additional leave. There is no evidence in the record, however, to demonstrate that Ms. Adkins knew when she could return to work with fewer restrictions; in fact, at the time of her deposition, she still had not been released for full duty. *See Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 346 (4th Cir. 2013) (rejecting plaintiff's argument that leave was a reasonable accommodation, because although the plaintiff requested a definite amount of leave, he failed to present evidence that the leave would have permitted him to perform the essential functions of his position at the time of his requested return date). Moreover, at the time Ms. Adkins's *extended* FMLA leave expired, she did not hold a position at (continued . . . )

requested, and the employee is unable to perform the essential functions of the formerly held position even if an alteration to that position is made, the "job in question" subject to evaluation under COMAR § 14.03.02.02(B)(10) is not the formerly-held job, but the vacant position to which the employee sought reassignment or transfer. Indeed, by their plain meaning, the words "*re*assignment" and "transfer" used in the regulation necessarily presume that the disabled individual seeking this accommodation is a present employee and that the possibility of a reasonable accommodation for that employee exists *beyond* simply altering the individual's existing job. The regulations expressly contemplate transfer to a *vacant* job.

In addressing similar ADA provisions concerning the transfer or reassignment of a "qualified individual with a disability,"[12] numerous United States Courts of Appeals have

---

PRMC, thereby leaving her unable to show that she could have performed the essential functions of a potential, unknown vacant position available at the time her leave would have expired. We note that PRMC suggests that it afforded Ms. Adkins a "reasonable accommodation" in the form of extended leave under the FMLA, but extended leave permitted under the FMLA does not necessarily satisfy the reasonable accommodation requirement under the MFEPA, especially where PRMC arguably had notice that Ms. Adkins still could not perform the essential functions of her position following that additional FMLA leave.

[12] The ADA's definition of a "qualified individual with a disability" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The distinction between the MFEPA and the ADA definition lies in the description of "employment position" for which the employee must perform the essential functions. Under Maryland law, the regulation refers to "the job in question," COMAR § 14.03.02.02(B)(10), whereas under federal law, the statute refers to the "position that such individual holds or desires." 42 U.S.C. § 12111(8). But the courts have considered the two definitions "nearly identical." *See Caire*, 982 F. Supp. 2d at 599. As well, the ADA's definition of a "reasonable accommodation" is consistent with the definition in (continued . . . )

21

reached a similar conclusion on this issue. *See, e.g., Burns v. Coca-Cola Enters., Inc.,* 222 F.3d 247, 257-58 (6th Cir. 2000) (holding that "an employer has a duty under the ADA to consider transferring a disabled employee who can no longer perform his old job even with accommodation to a new position within the [c]ompany for which that employee is otherwise qualified"); *Cravens v. Blue Cross & Blue Shield of Kansas City,* 214 F.3d 1011, 1018 (8th Cir. 2000) ("[W]e conclude that the definition of 'qualified individual with a disability' includes a disabled employee who cannot do his or her current job, but who desires and can perform, with or without reasonable accommodation, the essential functions of a vacant job within the company to which he or she could be reassigned."); *Smith v. Midland Brake, Inc.,* 180 F.3d 1154, 1162 (10th Cir. 1999) (en banc) (holding that "a qualified individual with a disability" includes "individuals who can perform an appropriate reassignment job within the company, with or without reasonable accommodation, even though they cannot perform their existing job no matter how much accommodation is extended" (citations omitted)).

Ms. Adkins concedes she could not perform the essential functions of her storekeeper position; even so, she could have been considered a "qualified individual with a disability" if she had carried her burden of establishing that she was able to perform the essential functions of a vacant position at PRMC, with or without a reasonable accommodation, to which she could be reassigned. As we turn to Ms. Adkins's claims of disability discrimination and failure to accommodate, we focus our

the MFEPA in so far as it provides that an accommodation includes "reassignment to a vacant position." 42 U.S.C. § 12111(9)(B).

enquiry on whether there was any material fact that remained in dispute before the circuit court as to whether Ms. Adkins was a "qualified individual with a disability." As noted *supra*, PRMC does not challenge the court's conclusion that Ms. Adkins is disabled, nor does PRMC argue that Ms. Adkins was terminated for some independent reason other than her disability. Therefore, we address Ms. Adkins's failure to accommodate claim first, as it is really the core of her challenge on appeal. Moreover, as we shall see, our analysis of her accommodation claim foreordains our decision regarding her disability discrimination claim.

## 1. Failure to Accommodate

To establish a *prima facie* case for a failure-to-accommodate claim, the employee-plaintiff must show: (1) that he or she was an individual with a disability; (2) that the employer had notice of his or her disability; (3) that with reasonable accommodation, he or she could perform the essential functions of the position (in other words, that he or she was a "qualified individual with a disability"); and (4) the employer failed or refused to make such accommodations. *Wilson*, 717 F.3d at 345 (citing *Rhoads v. FDIC*, 257 F.3d 373, 387 n.11 (4th Cir. 2001)). These elements are found directly in SG § 20-606(a)(4) establishing that it is unlawful for an employer to "fail or refuse to make a reasonable accommodation for the known disability of an otherwise qualified employee." "Although the duty to accommodate rests on the employer, the burden of proving that an employer could not have reasonably accommodated a handicapped employee does not arise *until* the employee presents his *prima facie* case." *Gaither*, 94 Md. App. at 583 (citing *Md. Comm'n on Human Relations,* 86 Md. App. at 178; *Jasany v. U.S. Postal Serv.,* 755 F.2d

23

1244, 1249-51 (6th Cir. 1985)); *see also Reyazuddin v. Montgomery Cnty., Md.*, ___ F.3d ___, ___, No. 14-1299, slip op. at 15 (4th Cir. 2015) (stating that upon satisfaction of employee's *prima facie* case, the employer may defend against the claim by showing that the accommodation is unreasonable or that it imposes an undue hardship).  Because, as we noted *supra*, PRMC does not challenge the court's ruling that Ms. Adkins has a "disability" as defined by the MFEPA, we consider the remaining elements of Ms. Adkins's *prima facie* case.

a. *Adequate Notice to Employer of the Disability and Need for Accommodation*

To receive an accommodation, the employee must "communicate[] to his employer his disability and his desire for an accommodation for that disability."  *Wilson,* 717 F.3d at 346-47 (citations omitted).  The employee need not submit a formal request for an accommodation, nor must the employee use "magic phrases"; instead, the employee must provide the employer with "adequate notice" of his disability and need for an accommodation.  *Pollard v. Balt. Cnty. Bd. of Educ.*, 65 F. Supp. 3d 449, 456 (D. Md. 2014) (quoting *Rock v. McHugh*, 819 F. Supp. 2d 456, 473 (D. Md. 2011)); *see Allen v. Balt. Cnty.*, ___ F. Supp. 3d ___, ___ Civil No. CCB-13-3075, slip op. at 16 (D. Md. 2015) (citation omitted); s*ee also Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 635 (6th Cir. 1998) (stating that the employee's request for an accommodation cannot be vague).  This requirement exists for the obvious reason that "[a]n employer simply cannot be expected to accommodate disabilities of which it is unaware."  *Pollard*, 65 F. Supp. 3d at 456-57 (citing *Adamczyk v. Balt. Cnty. Police Dep't,* 952 F. Supp. 259, 264 (D. Md. 1997)).  In determining whether the employee provided adequate notice of his or her

24

disability and need for an accommodation, the totality of the circumstances must be considered. *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999) ("What matters . . . [is] whether the employee or a representative for the employee provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation."), *abrogated on other grounds as stated in Rocco v. Gordon Food Serv.*, 998 F. Supp. 2d 422, 426 n.1 (2014).

In the instant case, the circuit court stated that it was "undisputed that [Ms. Adkins] never approached [PRMC] about any specific reasonable accommodations that would enable her to perform the essential duties of her employment." We disagree, and, as described below, conclude that the record reflects a genuine dispute of material fact regarding whether Ms. Adkins provided adequate notice to PRMC of her disability and need for an accommodation.

The summary judgment record discloses that, following her surgery and while on FMLA leave, Ms. Adkins updated her supervisor, James Bunk, as to her follow-up appointment and delivered a letter from her surgeon to him and PRMC's Employee Health Office. After she returned from her FMLA leave in November 2011, Ms. Adkins met with a nurse with the Employee Health Office and advised that she was no longer able to perform the essential duties of her storekeeper position due to her hip injury and her sedentary work restrictions. The Employee Health Office could not accommodate her restrictions. Ms. Adkins then took extended leave under the FMLA, and PRMC filled Ms. Adkins's storekeeper position. PRMC encouraged Ms. Adkins to apply for vacant

25

positions at PRMC, and Ms. Adkins did so. She applied for at least 14 separate positions and contacted PRMC to follow-up on some of the positions, but was not hired for any position.

PRMC claimed to have reached out to Ms. Adkins to "discuss with her what positions she might be able to perform" and that "Ms. Adkins did not return PRMC's call." Some of PRMC's employees, however, like Mr. Bunk, did not even consider Ms. Adkins to have a disability (giving rise to a reasonable inference, without further evidence in the record, that these employees did not try to accommodate her disability).

Based on the foregoing, a reasonable jury could conclude that PRMC had notice that Ms. Adkins was no longer able to perform the essential functions of her storekeeper position and, considering the totality of the circumstances, that she adequately notified PRMC that she needed assistance in locating a position that she could physically perform. PRMC knew that Ms. Adkins could not perform the storekeeper function; knew that the position had been filled; and knew that Ms. Adkins had been submitting applications for other vacant positions within the company to remain employed. We hasten to note that the mere submission of job applications by an employee following surgery or FMLA leave does not, alone, constitute an adequate request for an accommodation. An employer could logically assume that an employee applying for another job simply wants a new position. Standing alone, a job application does not automatically suggest a request for another position necessitated by a disability. However, in the instant case, Ms. Adkins's job applications were submitted in the context of PRMC's full knowledge, through its HR department and Ms. Adkins's supervisors, that Ms. Adkins *could no*

26

*longer perform* her former storekeeper position *because of* her disability. PRMC knew that Ms. Adkins had been placed on light-duty restriction and that Ms. Adkins would become unemployed, due to her disability and absent assistance, if she was unable to obtain a new position. Certainly there are also facts in the record upon which PRMC may rely in its favor; including, for example, that Ms. Adkins began submitting applications for alternative employment before her surgery and wanted to leave the storekeeper position. As well, PRMC emphasizes the limited extent of Ms. Adkins's efforts to keep in contact with PRMC during her job application process. But taken together, these particulars demonstrate that whether Ms. Adkins provided "adequate notice" of her disability and her need for assistance is a factual dispute left unresolved by the record. The record here is accordingly unsuitable for summary judgment.

      *b. The Federal Interactive Process and Maryland's "Individualized Assessment"*

Ms. Adkins further argues that following her adequate notice to PRMC that she needed an accommodation, PRMC failed to engage in an "interactive process" with her to help her identify a reasonable accommodation. The phrase "interactive process" is a feature of federal regulatory disability discrimination law:

> To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, **interactive process** with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(o)(3) (emphasis added). Although the regulation is phrased as permissive with the use of "may" rather than "shall," the employer's duty to engage an

employee in an interactive process is often construed as mandatory. *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 778 (6th Cir. 2015) ("We, along with many other circuits, have held that the employer's duty to participate in the interactive process in good faith is mandatory." (citation omitted)); *Fleetwood v. Harford Sys. Inc.*, 380 F. Supp. 2d 688, 701 (D. Md. 2005) ("[I]f it is not immediately obvious what accommodation would be appropriate, the ADA requires that the employer and employee engage in an interactive process to identify a reasonable accommodation." (citing *Bryant v. Better Bus. Bureau of Greater Md.*, 923 F. Supp. 720, 737 (D. Md. 1996); 29 C.F.R. § 1630.2(o)(3))).

The "interactive process" is generally triggered by an employee's adequate request for an accommodation. *Wilson*, 717 F.3d at 346-67. The United States District Court for the District of Maryland has explained the interactive process as follows:

> The EEOC suggests that the employer should take the following steps to accomplish th[e] goal [of the interactive process]: (1) analyze the particular job involved and determine its purpose and essential functions; (2) consult with the employee to ascertain the precise job-related limitations imposed by the disability and how they could be overcome; (3) in consultation with the employee, identify potential accommodations and assess the effectiveness of each in enabling the employee to perform his functions; and (4) consider the preference of the employee and implement the accommodation that is most appropriate for both the employee and employer. *Bryant,* 923 F. Supp. at 737.

> Responsibility for identifying an accommodation, however, is shared between the employer and employee. *See May v. Roadway Express, Inc.,* 221 F. Supp. 2d. 623, 627-28 (D. Md. 2002). A party that obstructs or delays the interactive process, or simply fails to communicate, is not acting in good faith to find a solution. *See Bultemeyer v. Fort Wayne Cmty. Sch.,* 100 F.3d 1281, 1285 (7th Cir. 1996). Nevertheless, an employer cannot escape liability simply because the employee does not suggest a particular reasonable accommodation that would assist him. *See Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 317 (3d Cir. 1999). The employer must work with the employee to determine what accommodation would

28

help. Similarly, an employee cannot prevail simply by demonstrating that his employer failed to engage in the interactive process; he also must show that this failure to engage in the process resulted in the failure to find an appropriate accommodation. *See Scott v. Montgomery County Gov't,* 164 F. Supp. 2d 502, 508 (D. Md. 2001).

*Fleetwood*, 380 F. Supp. 2d at 701.

Ms. Adkins argues that the obligatory "interactive process" under federal law is implicit in COMAR § 14.03.02.04(B)(3), which provides that it is an unlawful employment practice for a covered entity to

> **fail to make an individualized assessment of a qualified individual with a disability's ability to perform the essential functions of a job**, unless the qualification standard, employment test, or other selection criteria under which the individual was disqualified meet the requirements of a bona fide occupational qualification (BFOQ) reasonably necessary to the normal operation of the particular business or program.

(Emphasis added). As reflected by the plain language of this regulation, and unlike the federal regulation establishing the "interactive process" requirement (29 C.F.R. § 1630.2(o)(3)), Maryland law does not explicitly require an employer to engage in an "interactive process" to identify a reasonable accommodation. Although Maryland courts may rely on federal disability discrimination law to the extent that the federal statutes and regulations being analyzed are sufficiently similar to those of Maryland as to lend persuasive authority, we cannot supplant federal standards in place of Maryland standards. *Meade*, *supra*, 424 Md. at 489 (explaining that using federal cases to construe similar Maryland statutes is appropriate, but not when the statutes are different and could be construed to have different meanings); *Haas*, 396 Md. at 492 ("While it certainly is permissible to have recourse to federal law similar to our own as an aid in construction of

Maryland statutory law, it should not be a substitute for the pre-eminent plain meaning inquiry of the statutory language under examination." (citation omitted)). Thus, because of the difference between the federal and Maryland regulations, we cannot simply adopt the federal judicial and regulatory approaches to the interactive process, as advocated by Ms. Adkins.

Rather, we agree that COMAR § 14.03.02.04(B)(3) requires action akin to the interactive process; that is, an individualized assessment by the employer of the employee's abilities to perform the essential functions of a job. In our view, the "individualized assessment" provides stronger protection for the employee than the federal "interactive process" regulation because it *explicitly* provides that failure to conduct an individualized assessment constitutes an unlawful employment practice. Indeed, this provision necessarily imposes a clear, unambiguous obligation on the employer, which, in turn, extends protection to the disabled employee.

Moreover, because the COMAR regulation refers to "*a* job," not simply the job that the employee held, we do not interpret the individualized assessment requirement to be constrained to mean the job previously held by the employee; instead, we read it to require an employee-specific evaluation and a consideration of the essential functions of *a* job. In this case, the individualized assessment would include considering the vacant positions to which Ms. Adkins applied or, alternatively, another position available during the relevant time period in which PRMC could have transferred Ms. Adkins. Thus, when viewed in conjunction with the statutory requirement that an employer must provide a reasonable accommodation to an "otherwise qualified" employee with a known disability

30

absent undue hardship to the employer, SG § 20-606(a)(4), the "individualized assessment" requires an employer to assess the capabilities of the disabled employee to determine whether the employee is "otherwise qualified" for a vacant position and what reasonable accommodation may be made, including reassignment. In addition, in order to make an "individualized assessment," the employer would need to acquire an understanding of the employee's capabilities to perform various tasks as well as any impediments of the job that can be accommodated.

When viewed in the light most favorable to Ms. Adkins, we conclude that the record generates a genuine dispute of material fact regarding whether PRMC conducted an individualized assessment of Ms. Adkins. On one hand, according to PRMC, its Human Resources Department attempted to contact Ms. Adkins without success. Sara "Mitzi" Scott, Director of Human Resources, attested in an affidavit that "[w]hile Ms. Adkins was on leave, PRMC reached out to Ms. Adkins to discuss with her what positions she might be able to perform" and that "Ms. Adkins did not return PRMC's call." She similarly testified in her deposition that the "recruitment team tried to reach [Ms. Adkins] to see what she could do." From this information, a jury could determine that Ms. Adkins refused to participate in the requisite individualized assessment process.

On the other hand, according to Ms. Adkins, PRMC did not assist her with finding an accommodation. She testified in her deposition that PRMC advised that she should start applying to vacant positions, but did not help her in identifying any specific position. She further averred in her affidavit, "I recall speaking with Nikki Morris [with Human Resources] about the Core Tech position [to which I applied], but do not recall her

31

bringing up any other jobs I could do."

It also unclear whether any of Ms. Adkins's PRMC supervisors made any assessment of her capabilities. Mr. Phillips, director of the Materials Management Department, explained that because Ms. Adkins's surgery was a "personal choice" instead of a work-related injury, "[he] didn't take into consideration any legal requirements to consider her with a disability." He also testified that Ms. Adkins would not be able to satisfy the physical requirements of lifting and walking for the inventory control position to which she applied based on her restrictions, although he conceded that he did not consider whether the position could be modified to accommodate her. Mr. Bunk similarly testified that there were no sedentary positions in the Central Stores Department and, therefore, he did consider whether Ms. Adkins could be accommodated. Whether PRMC engaged in an individualized inquiry is a question of fact on which this record contains conflicting evidence. Thus, it was inappropriate for the trial court to grant summary judgment.

    c.     *Qualified Individual with a Disability: The Existence of Vacant Positions for which Ms. Adkins Was Qualified*

Even if a fact-finder were to conclude that PRMC failed to conduct an individualized assessment of Ms. Adkins, an employee does not automatically have a cause of action for failure to accommodate under the MFEPA based simply on this finding. Analogously, in the federal context, an employee does not have a cause of action under the ADA simply because the employer failed to engage in the interactive process. *See, e.g., Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 581 (4th Cir. 2015).

32

Rather, under both state and federal law, the employee still must identify a *reasonable* accommodation that could have been possible. *Cf. Wilson*, 717 F.3d at 346-47; *cf. U.S. Airways*, *supra*, 535 U.S. at 401 (reiterating that the ADA does not "demand action beyond the realm of the reasonable").

"Nearly every circuit court, including the Fourth Circuit, has held or strongly suggested that the Plaintiff bears the initial burden of requesting, identifying, or proposing a reasonable accommodation." *Bennett v. Kaiser Permanente*, 931 F. Supp. 2d 697, 716 n.4 (D. Md. 2013) (citations omitted); *see also Duvall v. Georgia-Pacific Consumer Prods., L.P.*, 607 F.3d 1255, 1263 (10th Cir. 2010) ("[A]t the summary judgment stage, the plaintiff-employee bears the burden of specifically identifying a vacant position, reassignment to which would serve as a reasonable accommodation." (citing *Taylor*, 196 F.3d at 1110)); *Cravens*, 214 F.3d at 1019-20 (stating that in order to be transferred to a different position, the employee "must 'satisfy the legitimate prerequisites for that alternative position, and . . . be able to perform the essential functions of that position with or without reasonable accommodations'" (quoting *Dalton v. Subaru-Isuzu Auto., Inc.*, 141 F.3d 677, 678 (7th Cir. 1998))). We consider an equivalent burden to be contemplated by Maryland disability discrimination law; indeed, the plaintiff's overall case cannot prevail at trial absent facts capable of supporting a rational jury's finding that a reasonable accommodation existed. Thus, we hold that a plaintiff must identify a vacant position to which he or she could have been reassigned as a reasonable accommodation.

To that end, Ms. Adkins argues that she identified and in fact applied for

numerous vacant positions both during her FMLA leave and following her termination for which she was qualified. Alternatively, she argues that the circuit court erred in denying her motion to compel PRMC to produce a list of all vacancies available at PRMC at the time she requested an accommodation, which we discuss *infra* in Part II of our discussion. At this juncture, we forecast our wariness of a grant of summary judgment on a failure-to-accommodate claim in lieu of permitting a plaintiff to access, if sought, information about all available vacancies during the relevant time period, as it is the plaintiff's burden to identify a vacant position constituting a reasonable accommodation. Indeed, although the employee may not have discovered and applied to the vacant position, the employer, upon receiving adequate notice of the need for an accommodation, is in a far better position than the employee to determine whether a position exists that the employee with a disability could perform.

As described earlier, Ms. Adkins applied for at least ten separate jobs before her termination and then submitted applications for another four positions after her termination. The circuit court concluded that Ms. Adkins was not qualified to perform the essential functions of any of these positions. We agree that it is beyond factual dispute that many positions required a requisite number of years of experience or skills beyond which Ms. Adkins had demonstrated that she possessed.[13] However, it is not

---

[13] For example, Ms. Adkins has not established that she had the requisite experience for the following: Code Abstractor I (one to two years of experience in computer entry and Microsoft Windows); Patient Service Rep–Medical Group (minimum of three years of experience in secretarial work and experience with Microsoft Office preferred); or Monitor Technician (successful completion of basic cardiac rhythm (continued . . . )

immediately clear that Ms. Adkins could not perform the essential functions of all the jobs to which she applied.

Although neither the Maryland Code nor COMAR define the meaning of "essential functions" of a job, this Court has established that job descriptions and testimony from the employer are relevant to that determination. *See Gaither*, 94 Md. App. at 579-82 (citing *Guinn v. Bolger,* 598 F. Supp. 196, 202 (D.D.C. 1984); *Hall v. U.S. Postal Serv.,* 857 F.2d 1073, 1079 (6th Cir. 1988)). Federal regulations provide us with further insight, identifying, for example, factors relevant to this analysis: written job descriptions; "[t]he employer's judgment as to which functions are essential"; "[t]he amount of time spent on the job performing the function"; "[t]he consequences of not requiring the incumbent to perform the function"; "[t]he work experience of past incumbents in the job"; and "[t]he current work experience of incumbents in similar jobs." 29 C.F.R. § 1630.2(n)(3). "Although the issue of whether a function is essential requires the weighing of evidence and is generally a question for the jury, it can be decided on summary judgment if no reasonable jury could find that a certain function is or is not essential." *Fleetwood*, 380 F. Supp. 2d at 699; *cf. Gaither*, 94 Md. App. at 590 (stating that "determination of whether 'legitimate physical qualifications may be essential to the performance of certain jobs' and 'determination of whether accommodation is possible are *fact specific issues*.'" (emphasis in original) (quoting *Hall v. U.S. Postal Serv.*, 857 F.2d 1073, 1079 (6th Cir. 1988))). Thus, on the record before

recognition course required; successful completion of medical terminology course preferred; and six months experience with cardiac monitoring preferred).

us, we examine more closely the essential functions of the core technician and inventory control coordinator positions to which Ms. Adkins applied.

i.     Core Technician

Ms. Adkins specifically argues that the evidence generates a factual dispute as to whether she could perform the essential functions of the "core technician" position with an accommodation.  In considering the above-cited factors, we disagree for the reasons explained below, and hold that there was no genuine dispute of material facts and that the trial court was correct in determining that Ms. Adkins could not perform the essential functions of the core technician position.

PRMC's job description for this opportunity reflected the following requisites and descriptions:

- **Job Summary:** "The primary function of the Core Tech is to provide both product support and information to the clinical staff of the [Operating Room], Central Processing and Cath Lab. Customer service is the focus to provide products, instrumentation and information necessary to meet supply needs in surgical services, central processing and the cath lab."

- **Education:** "Minimum - High School diploma or equivalent required."

- **Experience:** "Prior Central Processing or [Operating Room] experience desirable"; "Basic computer skills with Data Entry capability required."

- **Physical Activities:** 2/3 of the time standing, 2/3 of the time walking, under 1/3 of the time sitting; 2/3 of the time stooping, kneeling, crouching or crawling; 2/3 of the time computer use; 2/3 of the time lifting up to 24 lbs, and 1/3 of the time lifting up to 50 lbs.  Must be able to lift up to 50 lbs. unassisted.

PRMC considered the position to be physically demanding.  Laura McIntyre, the Operating Room Materials Manager (and supervisor of the core technicians), explained

36

that a core technician is responsible for taking inventory, organizing, maintaining paperwork, and putting orders away, which entails lifting instrumentation sets of 25-30 pounds apiece. A former core technician testified in her deposition that she would lift and handle various items ranging from 10 to 50 lbs. She stated that she and her co-workers would handle 15 items of this weight daily, and that she would handle five to ten 50-pound items herself on average daily. In her affidavit, Ms. Scott averred that the position "cannot be performed with the sedentary restrictions" and that "[n]o accommodation could be made permitting Ms. Adkins to perform those positions without removing essential job functions from the position[]."

Ms. Adkins, however, believed she could have performed the position's responsibilities. In her affidavit, Ms. Adkins averred:

> I could have performed [t]he Core Technician position because I could have obtained assistance from other Core Technicians with the lifting. By January I was getting better and would have been able to do the walking part of the position when the restrictions expired.

Ms. Adkins further explained in her deposition that although the job requirements involved functions with which she was having trouble, she applied anyway because these tasks were not as continuously demanding as her former storekeeper position and that she needed to remain employed, even if she was in pain while doing her job. Moreover, Ms. Adkins had knowledge that Justine Custis, another core technician, had the lifting requirement "waived." Ms. Custis testified in her deposition that when she is faced with an object weighing more than 20 lbs., she receives assistance from another employee.

37

Ms. Adkins interviewed with Ms. McIntyre on November 22, 2011, for this position and advised she thought she would be able to perform the physical tasks of the position, just not constantly all day long. According to Ms. Adkins, Ms. McIntyre responded that she could not extend a job offer because of her hip condition and the risk of her needing more surgeries. Ms. McIntyre, on the other hand, stated that Ms. Adkins was not hired because she "needed a body at that time" and Ms. Adkins had not yet been released for full duty.

Even viewing the evidence in the light most favorable to Ms. Adkins, we conclude that there is no genuine dispute of material fact that lifting is an essential function of the core technician position. The job description provides that 2/3 of the time is spent lifting items up to 24 lbs. and that 1/3 of the time is spent lifting items up to 50 lbs. The former core technician testified that the position required daily lifting, and Ms. McIntyre testified similarly. Moreover, Ms. Adkins believed she could perform the position *if* she could receive help with the lifting from another employee, as Ms. Custis did. First, we note that an employee's subjective belief that he or she could have fulfilled the essential functions of the job is not dispositive. *See Alexander v. Northland Inn,* 321 F.3d 723, 727 (8th Cir. 2003). But more importantly, an employer is not required to transfer job responsibilities to another employee to satisfy its obligation to reassign.[14] *See, e.g., Martinson v. Kinney*

[14] Other limitations on the employer's duty to reassign a disabled employee to a vacant position may include: (1) an employer is not required to create a new position for the employee; (2) the position must actually be vacant, in that the employer does not have to "bump" another employee from the position to reassign the disabled employee; (3) a position may not be considered vacant if, under a collective bargaining agreement, (continued . . . )

*Shoe Corp.*, 104 F.3d 683, 687 (4th Cir. 1997) ("The ADA simply does not require an employer to hire an additional person to perform an essential function of a disabled employee's position." (citing 29 C.F.R. Pt. 1630, App. at § 1630.2(o))); *Champ v. Baltimore Cnty.*, 884 F. Supp. 991, 999 (D. Md. 1995) (stating that an employer is not required to eliminate the essential functions of a job), *aff'd sub nom. Champ v. Baltimore Cnty., Md.*, 91 F.3d 129 (4th Cir. 1996); *see also Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 950 (8th Cir. 1999) ("While job restructuring is a possible accommodation under the ADA, . . . an employer need not reallocate or eliminate the essential functions of a job to accommodate a disabled employee."). Ms. Adkins's request for assistance with lifting would excuse her from performing that essential function; it would not enable her to perform it. *See Moore v. Jackson Cnty. Bd. of Educ.*, 979 F. Supp. 2d 1251, 1265 (N.D. Ala. 2013) ("[P]laintiff's request would not *allow* her to perform the essential functions of her job; instead, it would *exempt her* from performing those functions."). Although the foregoing cases are all federal cases interpreting the federal ADA, we know of no reason why an employer should be required to transfer job responsibilities to another employee to satisfy its obligation to reassign under Maryland law.

In addition, there is nothing in the record to support Ms. Adkins's bald allegation that PRMC sanctioned Ms. Custis's request for assistance from her coworkers as an

another employee has a vested priority right to the vacant position; and (4) the employer is not required to promote the employee in order to reassign. *Midland Brake, Inc.*, 180 F.3d at 1174-78. The Supreme Court in *U.S. Airways v. Barnett*, 535 U.S. 391, 403 (2002), established, for example, that an employee's request for reassignment to a particular position conflicted with seniority rules and, therefore, was not "reasonable" as a matter of law.

accommodation or waiver. This distinguishes the instant case from, for example, *Iowa Beer & Liquor Control Dep't Store 1023 v. Iowa Civil Rights Commission*, 337 N.W.2d 896, 899 (Iowa Ct. App. 1983), cited by Ms. Adkins, where the *employer's* testimony provided support for the conclusion that the employer-store could have accommodated the disabled employee unable to do heavy lifting. Thus, the evidence on summary judgment reflects that no reasonable jury could find that Ms. Adkins was "otherwise qualified" for the core technician position, because she was unable to perform the essential function of lifting.

ii.  Inventory Control Coordinator

Ms. Adkins argues that the evidence reflects, at least a factual dispute, as to whether she could perform the essential functions of the "inventory control coordinator" position. In considering the aforementioned factors, we agree that there is a dispute of material fact on this point.

PRMC's job description for this position reflected the following requisites and descriptions:

- **Job Summary:** "Responsible for maintaining control of the inventory asset account in the Cardiac Catheterization and Electrophysiology labs. This includes overseeing the daily ordering, receiving, and issuing functions. It also includes completing all adjustments, physical inventories, cycle counts, and par level distributions. Must work closely with finance to maintain integrity between physical and perpetual inventory. Assists where necessary in the ordering of inventory items. Recommends and supports goals and objective[s] that are consistent with the mission statement of Peninsula Regional Medical Center. Delivers exceptional quality and service to all patients and other customers."

- **Education:** "High School graduate preferred, College graduate

40

preferred"

- **Experience:** "Bachelor's Degree or 4 years Medical/Surgical Supply or Logistic experience required. Valid driver's license and verification of insurability under Peninsula Regional Medical Center's automobile insurance plan."

- **Physical Activities:** 1/3 of the time standing, 1/3 of the time walking, 1/3 of the time sitting. 2/3 of the time using computers. 1/3 of the time using equipment. 1/3 of the time stooping, kneeling, crouching or crawling. Under 1/3 of the time lifting up to 10-50 lbs. Must be able to lift up to 50 lbs. unassisted.

In her affidavit, Ms. Adkins demonstrated that she had previous experience working in Inventory Control:

> I was an assistant to Sherry Pruitt in the Heart Center Inventory Control, commonly referred to as the "Cath Lab," from about 2005 through 2010, and am familiar with the work. . . . I heard about the Inventory Control Coordinator position and on January 17, 2012 sent an email to Scott Phillips, Director of Materials Management and Laura McIntyre, OR Materials Manager (Ex. 19, 22) to be considered for the position . . . . I know I could have performed the work because, having worked there for four years, there is very little heavy lifting. The primary heavy item which needed to be handled by the Inventory Control Coordinator on a regular basis were boxes with Intra Venous (IV) fluid bags, weighing more than 20lbs, which had to be received and stored. I could have easily handled these boxes by opening the boxes and taking out the IV bags individually. Each of the bags weighed less than 5 lbs. There was generally about one hour of walking during the course of a day to the Cath and EP labs to take inventory every day and put the supplies out where they belonged. The supplies that were received were usually brought up by some one else from Central Stores. The position was mentally demanding because of the need to track inventory and computer input required for the position.

Ms. Adkins further testified during her deposition that she was familiar with the physical requirements of the position; that such requirements were "a lot less than when I was up there"; and that from her experience, she felt she would be able to do the actual job but perhaps not exactly what PRMC had described the job to entail in its description.

41

According to PRMC, however, the position was physically demanding. PRMC points to deposition testimony from Sherry Pruitt, who formerly worked as an inventory control coordinator. She affirmed that the position was physically demanding; that she was on her feet often; and that she did a lot of walking. Mr. Phillips also testified in his deposition that Ms. Adkins would not be able to satisfy the physical requirements of lifting and walking based on her restrictions. Ms. Scott testified in her deposition that Ms. Adkins could not fulfill the position because of the lifting and walking and that she remembered that the job is physical; "[i]t's not sedentary. It's not sitting at a desk." In her affidavit, she also averred that the position "cannot be performed with the sedentary restrictions" and that "[n]o accommodation could be made[.]"

In an e-mail dated January 17, 2012, Ms. Adkins contacted Mr. Phillips and Ms. McIntyre, asserting that she had learned about the inventory control coordinator position opening. She stated,

> With my prior position in the Cath Lab as the assistant I was wondering if I would be considered for the position. I am still released under Doctors orders under sedentary work but [from] prior knowledge of the job I know that the job is mostly sedentary and I do have the experience and know how for the position.

Upon receiving this e-mail, Mr. Phillips contacted Ms. Scott, who advised that "[e]mployees that are on extended leave are encouraged to apply for positions" but asked whether Ms. Adkins "worked in the cath lab in the past and was moved to a different position." Mr. Phillips responded that Ms. Adkins did formerly work there, but queried, "How can she apply when she cannot physically do the job? Just curious. The position is not conducive to being sedentary." The e-mails indicate (and a jury might well infer) that

42

Mr. Phillips and Ms. Scott likely thereafter met in person to discuss Ms. Adkins's interest in the position. On January 18, 2012, Mr. Phillips responded to Ms. Adkins:

> I spoke to Mitzi about your interest in the Cath Lab position and we would need to have a full release from our doctor before you would be able to apply for a position.
>
> Do you have an idea as to when you will have a full release without restrictions?

During her deposition, Ms. Adkins testified that she did not respond to the e-mail because she did not know the answer to the question posed and that no one from PRMC followed-up with her regarding the position either.

When viewing the evidence in the light most favorable and drawing all inferences in favor of Ms. Adkins, we conclude that there is a genuine dispute of material fact regarding whether Ms. Adkins could perform the essential functions of this position. We have explained that the employee "need not be able to perform all the duties of the job at issue—rather, he must only be able to perform the *essential duties* of the job." *Gaither*, *supra*, 94 Md. App. at 578 (emphasis added) (citations omitted). There is no doubt that the inventory control coordinator position entails some physical tasks, but neither the job description nor the deposition testimony conclusively establish that the walking and lifting requirements are "essential" to the functionality of the position, such that judgment should be entered as a matter of law instead of submitted to a jury to fulfill its fact-finding endeavor. The job description provides that 1/3 of the time is spent standing and walking, and less than 1/3 of the time is spent lifting—that the position involves standing/lifting does not necessarily mean, on this record, that those duties are essential.

Moreover, Ms. Adkins's assertions regarding her capacity to fulfill the duties of the position do not constitute an unfounded belief that would be immaterial to our analysis. Ms. Adkins had first-hand knowledge from working in the Cath Lab for over four years. Her affidavit and deposition testimony relate to "[t]he work experience of past incumbents in the job," and are evidence of the essential functions of a job under 29 C.F.R. § 1630.2(n). Her alternative method of breaking down heavier items for lifting also could have been feasible if considered. Therefore, what the essential functions of the inventory control coordinator included, as well as whether Ms. Adkins could perform those functions, are questions of fact.

We disagree with Ms. Adkins's contention that Mr. Phillips's statement in his e-mail that she would have to be returned to full duty constituted a "100% healed" requirement amounting to *per se* disability discrimination. An employer's obligation to provide an accommodation is limited to providing a *reasonable* accommodation, and it was PRMC's position that Ms. Adkins would need to be released to full duty. It did not require her to be completely healed, but rather, to be sufficiently healed to perform the essential functions of the job.

PRMC emphasizes that Ms. Adkins failed to formally apply for the position.[15] For

---

[15] A fact-finder could reasonably conclude that Ms. Adkins did not formally apply because Mr. Phillips affirmatively stated in his e-mail that she could not be hired until she could be released to full duty. Moreover, she did request to be considered. It could also be reasonably found that Ms. Adkins did not respond to the e-mail because she did not know the answer to Mr. Phillips's question, or, equally so, that she neglected to engage in a conversation with PRMC regarding her qualification for the position at all. These issues are ripe for fact-finding.

a failure-to-accommodate claim, where the employee provided adequate notice that he or she has a disability and needs an accommodation, we do not consider a formal application to a particular position to be necessary. Indeed, many federal courts have even reached the broader conclusion that the obligation to reassign in the context of a failure to accommodate claim is not even limited to reassigning the employee to an actual vacant position, but also those that may soon become vacant—positions to which the employee could not have even applied. *See, e.g.*, *Cravens*, 214 F.3d at 1019 n.5.

### d. PRMC's Refusal to Make a Reasonable Accommodation

The last element of the *prima facie* case for failure-to-accommodate is whether PRMC refused to make the reasonable accommodation. We have concluded that there were genuine disputes of material fact regarding whether Ms. Adkins was a qualified individual with a disability, i.e., whether she requested an accommodation and could have performed the essential functions of the inventory control coordinator position as to make that reassignment a "reasonable accommodation." Whether PRMC refused to make a reasonable accommodation based on the foregoing is also an issue requiring factual resolution.

As noted, once an employee identifies a reasonable accommodation, the burden shifts to the employer—here PRMC—to show that the accommodation would be unreasonable or would constitute an undue hardship. PRMC does not make these arguments on appeal, although they may be raised on remand. PRMC does, however, refer to a light duty policy that precludes light duty work for injured employees unless there is a significant need for the work. Ms. Scott testified in her deposition that before

2013, light duty was only provided "under extreme circumstances, when we had a dire need for staffing and for functions to be performed for patient care." This policy applied to both work-related injuries and personal injuries.[16] Melissa Mattox of PRMC's Employee Health Office testified that in 2011, light duty was "discouraged," but available. We consider such a blanket "no light duty" policy without some justification to teeter on the edge of *per se* disability discrimination, as it could prevent the employer from considering a reasonable accommodation to facilitate the disabled employee's ability to perform the essential functions of a particular position, as required by the MFEPA. Indeed, as the Supreme Court has stated, "[t]he simple fact that an accommodation would provide a 'preference'—in the sense that it would permit the worker with a disability to violate a [neutral] rule that others must obey—cannot, *in and of itself*, automatically show that the accommodation is not 'reasonable.'" *U.S. Airways*, 535 U.S. at 398.

Here, PRMC did not frame the policy as necessary for the department to operate or for a safe work environment. As noted, PRMC could show, if it is the case, on remand that light duty work in the Materials Management Department was unreasonable or would cause an undue hardship on its business. But PRMC has not cast the policy in this light. Thus, to the extent that this policy is raised to support PRMC's actions in not providing an accommodation to Ms. Adkins, we reject it at this juncture.

---

[16] In 2013, PRMC changed its policy to only afford the light-duty option to employees who were injured on the job; this policy change occurred after the instant lawsuit commenced.

46

## 2. Disability Discrimination

We next turn to the "disability discrimination" claim based on actual disability. To assert a *prima facie* case for disability discrimination, a plaintiff must show three elements: (1) that he or she has a disability; (2) that notwithstanding that disability, he or she was otherwise qualified for the employment with or without reasonable accommodation; and (3) he or she was excluded from employment on the basis of his or her disability. *See Ridgely*, *supra*, 164 Md. App. at 232 (citations omitted). As noted *supra*, PRMC does not challenge the court's conclusion that Ms. Adkins is disabled. It also does not argue that Ms. Adkins was terminated for some independent reason other than her disability, aside from its argument that she was not qualified[17] or that her FMLA leave had been exhausted.[18] Thus, the element in dispute is whether Ms. Adkins was a qualified individual with a disability.

---

[17] There is evidence in the record, which is mentioned in the briefing, that Ms. Adkins was involved in a substance abuse program pursuant to an agreement with PRMC. Specifically, there was evidence that Ms. Adkins failed to comply with this program, which was a ground for termination. However, PRMC did not learn that Ms. Adkins failed to complete the program until *after* her termination.

[18] In its briefing, PRMC consistently notes that its termination of Ms. Adkins's employment was consistent with the FMLA. Although PRMC does appear to have acted consistently with FMLA requirements, we note that this does not obviate PRMC's obligations to comply with the MFEPA or the ADA. Indeed, regarding reinstatement, the FMLA regulations provide:

> If the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition or an injury or illness also covered by workers' compensation, the employee has no right to restoration to another position under the FMLA. The employer's obligations may, however, be governed by the Americans with Disabilities Act (ADA), as amended. See §

(continued . . . )

47

Based on our analysis of Ms. Adkins's failure-to-accommodate claim, we concluded that a genuine dispute of material fact existed regarding whether she was a qualified individual with a disability. The same conclusion applies here. Thus, we hold that there is a genuine dispute of material fact regarding whether PRMC's failure to hire Ms. Adkins for the inventory control coordinator position constituted disability discrimination.

## II.

### Motion to Compel

Ms. Adkins next contends that the circuit court erred in denying her motion to compel.[19] Ms. Adkins filed a motion to compel on December 26, 2013, requesting that the court compel production of certain documents not produced in discovery, namely, the personnel files of Quinnie McBride, Kim Horsey, Patrick Ritchie, Justine Custis, Ethyl Harper, and Brenda Phippin, all of whom worked as or were hired as core technicians in the months following Ms. Adkins's surgery. She sought these documents in order to support her position that she was as qualified for the core technician position, as were the hired employees, and to determine whether any accommodations were afforded to these individuals. PRMC responded on July 8, 2014, arguing that Mr. McBride and Ms.

825.702, state leave laws, or workers' compensation laws.

29 C.F.R. § 825.216(c).

[19] At the hearing held on April 30, 2013, the circuit court ruled on the record that the motion to compel was denied outright, and the docket entry reflected the same. Thus, we reject Ms. Adkins's characterization of the court's ruling on motion to compel as a denial based on being "moot."

Phillips possessed core technician positions in Central Processing, a different position from the OR core technician position at issue; that Ms. Adkins failed to engage in discovery in good faith and that PRMC offered to produce various documents; and that her requests were overly broad. On January 21, 2014, Ms. Adkins amended the motion to compel to add a request for "[a]ll documents relating to all non-professional jobs or positions that became vacant and non-professional jobs or positions for which applications were sought between September 1, 2011 and May 1, 2012." She sought these documents to determine whether there were other vacant positions, beyond those to which she applied, that she could have been qualified for and thus those to which PRMC failed to transfer her. PRMC did not respond.

Maryland Rule 2-402(a) provides that a party may obtain discovery "if the matter sought is relevant to the subject matter involved in the action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party." Maryland Rule 2-431 requires a proponent of a motion seeking to resolve a discovery dispute to have acted in good faith to resolve the dispute:

> A dispute pertaining to discovery <u>need not be considered by the court</u> unless the attorney seeking action by the court has filed a certificate describing the good faith attempts to discuss with the opposing attorney the resolution of the dispute and certifying that they are unable to reach agreement on the disputed issues. The certificate shall include the date, time, and circumstances of each discussion or attempted discussion.

(Emphasis added); *see also Rodriguez v. Clarke*, 400 Md. 39, 65 (2007) (stating that parties must engage in a "sincere" attempt to resolve a discovery dispute). "Trial courts are vested with a reasonable, sound discretion in applying [the discovery rules], which

49

discretion will not be disturbed in the absence of a showing of its abuse." *Falik v. Hornage,* 413 Md. 163, 182 (2010) (internal quotation marks and citation omitted).

As to the personnel files, we cannot find that the circuit court abused its discretion in declining to compel production of these documents. First, although Ms. Adkins included a certificate of good faith along with her first motion to compel, it is unclear whether her counsel ever responded to PRMC's communications. PRMC argued to the circuit court that an e-mail from PRMC's counsel to Ms. Adkins's counsel (contained in the record) reflects that PRMC agreed to provide Ms. Adkins with portions of the personnel files relating to accommodations, if any, afforded to other core technicians, and that no response was made by Ms. Adkins's counsel. More importantly, Ms. Adkins has not demonstrated that the personnel records requested were relevant to the issues to be decided at trial. As we concluded *supra,* there was no genuine dispute of material fact regarding whether Ms. Adkins was a qualified individual with a disability for the core technician position, because she was physically unable to perform the essential function of lifting, and because PRMC is not required to reallocate this task to another employee or waive this essential function. Moreover, we also concluded that even if PRMC waived the lifting function or sanctioned help from other employees for Ms. Custis, PRMC is not required to provide that same accommodation to Ms. Adkins. Therefore, at this juncture, we cannot say the court erred in denying the motion to compel production of these files.

As to the production of all documents concerning vacancies during the 9-month period at issue, we conclude that the circuit court abused its discretion in denying the

motion to compel.[20]  On its merits, this discovery request was relevant to the failure to accommodate claim, in that the information about vacancies could have revealed a position for which Ms. Adkins was qualified and to which she could have been assigned as a reasonable accommodation.  Indeed, as explained *supra,* Ms. Adkins, as the plaintiff, bears the burden of identifying a vacant position for which she was qualified and to which PRMC could have reassigned her, and the court's failure to permit access to this information could have precluded Ms. Adkins from satisfying her *prima facie* case, if in fact such a vacancy existed.  In other words, the information requested fell within the ambit of discoverable, admissible evidence.  Thus, on remand, the circuit court must order PRMC to produce a list of all vacancies available during the time period requested.

> **AFFIRMED IN PART AND REVERSED IN PART.  DENIAL OF MOTION TO COMPEL AFFIRMED AS TO PERSONNEL FILES, REVERSED AS TO PRODUCTION OF VACANCIES; GRANT OF APPELLEE'S MOTION FOR SUMMARY JUDGMENT REVERSED.  CASE REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.**
>
> **COSTS ASSESSED TO APPELLEE.**

---

[20] At the hearing, PRMC's counsel argued that the motion was not accompanied by a certificate demonstrating a good faith attempt to resolve this dispute; however, the motion was "an amendment to" the prior motion to compel, not a new motion in its own right.  As an amendment, the certificate of good faith compliance was sufficient for the production of the vacancies as well, and nothing in the record, aside from PRMC's proffer, reflects a failure to engage in discovery in good faith.